In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 21-3221

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROYEL PAGE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:17-cr-00175-MYS-9 — **Michael Y. Scudder**, *Circuit Judge.*[*]
_____

ARGUED MAY 22, 2024 — DECIDED DECEMBER 18, 2024

_____

Before SYKES, *Chief Judge*, and EASTERBROOK, ROVNER,
BRENNAN, ST. EVE, KIRSCH, JACKSON-AKIWUMI, LEE, PRYOR,
and KOLAR, *Circuit Judges*.[**]

_____

[*] Of the United States Court of Appeals for the Seventh Circuit, sitting
by designation.

[**] Circuit Judges Scudder and Maldonado did not participate in the
consideration or decision of this appeal.

KIRSCH, *Circuit Judge*. Royel Page was charged with twelve counts of attempted heroin distribution and one count of drug conspiracy. At trial, the government proved that Page repeatedly purchased distribution quantities of heroin from Terrance Hamlin for over a year. Further, the government presented evidence of Hamlin and Page's relationship that substantially showed a heightened level of trust between them. For his part, Page denied involvement in the drug trade altogether, painting Hamlin as a biased witness who wholly lied about their drug transactions. The jury convicted Page on all counts.

Page appealed his conspiracy conviction on two grounds. First, he argued that the government failed to present sufficient evidence to sustain his conspiracy conviction. Second, he urged us to find that the district court plainly erred by not sua sponte giving a buyer-seller jury instruction, even though he affirmatively approved the district court's final instructions and never argued that he and Hamlin had a mere buyer-seller relationship. A panel of our court agreed with Page's second argument and remanded his case for a new trial. We vacated the panel's opinion and voted to rehear the case en banc.

Our conspiracy and buyer-seller jurisprudence has strayed far from the Supreme Court's decision in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943). Today, we fix that deviation by holding that repeated, distribution-quantity drug transactions alone can sustain a conspiracy conviction. Further, we apply the plain error standard as established in *United States v. Olano*, 507 U.S. 725 (1993), something we have not always done in our recent case law. In short, because the evidence more than sufficiently supports Page's conspiracy

conviction, and because the district court did not err, let alone plainly err, in not sua sponte providing a buyer-seller jury instruction, we affirm.

I

A grand jury charged Royel Page, Terrance Hamlin, and others with conspiracy to possess with intent to distribute 100 or more grams of heroin, fentanyl, and cocaine. 21 U.S.C. §§ 841(a)(1), 846. Page was also charged with twelve counts of attempt to distribute and possess with intent to distribute heroin. Unlike Hamlin and the other defendants, who all pleaded guilty, Page proceeded to trial.

At trial, the government presented substantial evidence of Page's guilt. For over a year and a half, Page purchased heroin from Hamlin multiple times a week. The quantity of heroin varied with each transaction, but Hamlin testified that Page typically purchased between 5 and 56 grams, with the quantities steadily increasing over time. Hamlin also testified that he eventually sold heroin to Page at a lower price per gram because Page distributed his supply quickly.

Though not related by blood, Page and Hamlin maintained a close relationship that they likened to one between an uncle and a nephew. The pair met in person or over the phone hundreds of times to arrange drug deals and exchange heroin. The government introduced wiretaps of approximately 133 calls between the two. Hamlin walked the jury through these calls and explained the coded language he and Page used to discuss the details of their heroin transactions. Hamlin explained that they often did not need to discuss price, however, because he had an established price per gram rate for Page's purchases.

Surveillance corroborated Hamlin's testimony. On one occasion, for example, Detective Nathan Pennes observed Hamlin park his vehicle outside Page's house shortly after the pair had a phone call discussing the sale of 45 grams of heroin. Det. Pennes watched Page exit his home, walk to Hamlin's car, and enter the passenger side. A few minutes later, Page returned home, and Hamlin drove away. Based on his experience and training, Det. Pennes testified that this interaction likely involved the 45-gram transaction that Page and Hamlin previously discussed.

In addition to Page's repeated, large-scale drug transactions with Hamlin, the government introduced evidence shedding further light on the nature of the pair's burgeoning business relationship. For example, Hamlin expressed skepticism at having anyone other than Page involved, testifying that he warned Page to keep his cousin out of the "business." And in line with this view, a recorded phone call showed that Hamlin was particularly protective of Page, with Hamlin noting that he could not have the same business relationship with others because Page "earned what [he was] doing." Moreover, Hamlin allowed Page to purchase heroin partially on credit, further evidencing the heightened trust between the pair.

Hamlin testified that, from the beginning, he saw a potential for growth in his drug-dealing venture with Page. And at one point, Page was agreeable to helping Hamlin expand his heroin dealing "up north," emphasizing to Hamlin in a call that "we can do this" and that he could provide Hamlin with his expertise in cutting heroin.

Additionally, the government introduced evidence showing that Page and Hamlin jointly sought to ensure the

delivery of high-quality heroin to Page's customers. For example, on one occasion, Page told Hamlin that the delivered supply of heroin was "no good" and asked to switch it out. Page informed Hamlin that this requested recall was for a customer that "spends good money" and whose business he could not afford to lose. Hamlin agreed to replace the heroin.

The government introduced significant expert testimony on drug conspiracies and transactions. Wisconsin Department of Justice Agent Jay Novak described the general inner workings of drug conspiracies and explained how drug traffickers typically further each other's efforts to distribute drugs. Moreover, Agent Novak compared personal-use quantities of heroin with distribution quantities. While Agent Novak testified that heroin quantities of a gram or less typically reflect purchases made for personal use, quantities above two grams—like those purchased by Page—are exemplary of distribution levels.

Throughout trial, Page proceeded under the theory that he was not involved in the drug trade at all, broadly challenging the evidence that connected him to Hamlin and the intercepted phone calls. For example, through cross examination and closing argument, Page's counsel spent considerable time painting Hamlin as a liar who had a lot to gain in falsely testifying for the government. In doing so, Page's counsel asked the jury to consider "who was on that telephone line." Additionally, Page's counsel tried to cast doubt on the criminality of Page's meetings with Hamlin. Page's counsel highlighted that law enforcement never physically observed Page and Hamlin exchange drugs and suggested instead that their meetings were innocent encounters between family friends that involved the exchange of innocuous items.

At the close of evidence, the district court and the parties proceeded with a jury instruction conference. Neither party asked for a buyer-seller instruction. At the close of the conference, the district court asked Page's counsel, "[F]or the record the defense is good with the jury instructions, what's in and what's not in?" Page's counsel responded, "Yes."

Ultimately, the jury convicted Page on all counts. Page proceeded to sentencing, where he faced a Sentencing Guidelines range of 97–121 months. The district court sentenced Page to 90 months on each count to be served concurrently, and Page appealed, raising two challenges. First, he argues that there was insufficient evidence to support his conspiracy conviction. Second, he argues that the district court plainly erred by not giving a buyer-seller jury instruction sua sponte.

## II

We turn first to Page's sufficiency-of-the-evidence challenge. For such a challenge, we view the evidence in the light most favorable to the prosecution. *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). To prevail, Page must show that no rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Id.* We have time and again described a defendant's burden under this standard as "nearly insurmountable." *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016) (quotation omitted).

We begin by explaining how our conspiracy and buyer-seller jurisprudence has drifted far from the Supreme Court's guidance. See *United States v. Brown*, 726 F.3d 993, 1000–01 (7th Cir. 2013) (describing the tension and inconsistency in our buyer-seller case law). After correcting course, we stress

that Page's conviction would stand even under our now-overruled precedent.

## A

To sustain a conspiracy conviction, the government must prove that two or more people agreed to commit an unlawful act and that the defendant knowingly and intentionally joined in that agreement. See *United States v. Wright*, 85 F.4th 851, 861 (7th Cir. 2023). For a drug-distribution conspiracy, there must be sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that the defendant knowingly agreed, at least implicitly, to distribute drugs with another. *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 924–25 (7th Cir. 2022); see also *United States v. Shabani*, 513 U.S. 10, 15 (1994) (government need not prove an overt act). This inquiry often leads us to distinguish between conspiracies and mere buyer-seller relationships because "[e]vidence showing only that two people are in a buyer-seller relationship is insufficient to prove a drug-distribution conspiracy." *Hidalgo-Sanchez*, 29 F.4th at 925. However, how we have articulated this distinction has often been confusing and flawed.

The leading authority on the buyer-seller doctrine is *Direct Sales Co. v. United States*, 319 U.S. 703 (1943). In that case, Dr. John Tate purchased from Direct Sales Co. large quantities of morphine sulphate, which he then illegally distributed to others. *Id.* at 704. Specifically, for several years, Direct Sales sold Tate thousands of morphine sulphate tablets annually, even though "the average physician in the United States [did] not require more than 400 one-quarter grain tablets annually for legitimate use." *Id.* at 706. Based on these repeated, distribution-quantity transactions, Direct Sales was convicted of conspiracy to distribute narcotics. *Id.* at 704. Direct Sales

appealed, relying on the Court's then-recent decision in *United States v. Falcone*, 311 U.S. 205 (1940), for the premise that mere sales to a buyer combined with knowledge that the buyer would use the sold items illegally is not enough to sustain a conspiracy conviction. See *Direct Sales*, 319 U.S. at 708. The Court rejected that comparison, noting that *Falcone* "[came] down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." *Id.* at 709; see also *id.* at 710 (noting that the Court in *Falcone* was not asked to determine whether there was sufficient evidence to sustain a conspiracy between the buyer and seller).

Instead, the Court distinguished the nature of the goods in *Falcone* (there, the defendant sold sugar and yeast to secondary illegal distillers), which "were articles of free commerce" that "left the seller's stock and passed to the purchaser's hands" as unrestricted commodities capable of "further legal use." *Id.* at 710. The illegality of morphine, as compared to the legality of sugar and yeast, proved critical to sustaining Direct Sales's conspiracy conviction for two reasons: "One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further, promote and cooperate in it. This intent … is the gist of conspiracy." *Id.* at 711; see also *id.* (opining that the "difference between sugar, cans, and other articles of normal trade … and narcotic drugs, machine guns and such restricted commodities" arises from "the latters' inherent capacity for harm and from the very fact they are restricted" and thereby "makes a difference in the quantity of proof required

to show knowledge that the buyer will utilize the article un-lawfully").

The Court's reliance on this distinction makes sense. There is an inherent and necessary trust between parties to an illegal transaction—at the least, that the other will not reveal the transaction to law enforcement—that is not shared by buyers and sellers of innocuous items. For this reason, facts such as "quantity sales" or "abnormal increases in the size of the buyer's purchases, … which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise." *Id.* Intent "is not unrelated to" knowledge. *Id.* When the evidence establishes repeated, distribution-quantity transactions in an illicit market, "[t]he step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge …. There is informed and interested cooperation, stimulation, instigation." *Id.* at 713.

A contextual breakdown of the relationship between a buyer and seller is instructive. Consider the relationship as it proceeds in the drug distribution setting. First, a seller sells distribution quantities of a drug to a buyer. (Keep in mind the government must still prove that the quantity of drugs sold was indicative of further distribution. This is crucial as it pro-vides the circumstantial evidence of the seller's knowledge—namely, that the buyer will sell the drugs to others rather than simply consume them himself.) At this point, the seller knows that the buyer has purchased drugs from him for further ille-gal distribution. Yet, despite this known illegality, the seller continues to sell distribution quantities of drugs to the buyer,

and the buyer willingly continues to purchase said quantities. In this way, the buyer and seller develop, in part, a codependent business relationship wherein they have a shared stake in each other's success. As the buyer's distribution to downstream clients thrives, so too does the seller, now a willing participant in the dealing through his provision of stock for the buyer's enterprise. And if the buyer's own customer base grows, he might need to purchase even more drugs (in frequency or quantity) from the seller to satisfy increased demand. This too enhances the stake in the pair's relationship. Thus, far from a mere, arms-length buyer-seller relationship, such evidence of repeated, distribution-quantity transactions, given the mutually known benefits that flow from such transactions, shows that the buyer and seller knowingly and intentionally entered into an implicit agreement to distribute drugs.

Of course, a single sale of a restricted good in a low quantity does not, by itself, support a charge of conspiracy, even if the seller knows that the good will be used for further illegal activity. *Id.* at 712. But this does not mean that a seller can sell contraband "in unlimited quantities." *Direct Sales*, 319 U.S. at 712. Rather, as plain from the hypothetical above, when the evidence shows that a buyer and seller worked in "prolonged cooperation" for a plainly unlawful purpose—the seller supplying the buyer with stock for his illicit enterprise—"there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible." *Id.* at 713. This is so even if the agreement between the buyer and seller "was a tacit understanding, created by a long course of conduct and executed in the same way." *Id.* at 714. After all, a conspiracy conviction by its very nature requires proof based largely (and

often, solely) on circumstantial evidence. Thus, when the charged conspiracy involves the distribution of illicit goods, the amount of proof needed to support the conspiracy conviction lessens because the illicit nature of the goods itself serves as a factor supporting an agreement between a buyer and seller. For these reasons, the Supreme Court had no trouble affirming Direct Sales's conspiracy conviction based solely on evidence of repeated, distribution-quantity sales of morphine.

All told, *Direct Sales* provides three principles for determining which types of buyer-seller relationships are indicative of a conspiracy. First, repeated, distribution-quantity sales of innocuous goods between a buyer and seller do not, on their own, show a conspiratorial agreement, even when the seller knows that the buyer plans to use those innocuous goods for illicit activities. Second, a buyer and seller involved in a low-quantity exchange of illicit goods merely for the buyer's personal use are likewise not, without more, engaged in a conspiracy. Third, a drug conspiracy conviction can be sustained if the government proves that a buyer and seller engaged in repeated, distribution-quantity drug transactions. See *id.* at 714–15 (noting that a conspiracy conviction can stand "notwithstanding the overt acts consist solely of sales, which but for their volume, frequency and prolonged repetition, coupled with the seller's unlawful intent to further the buyer's project, would be wholly lawful transactions").

Our holding today departs from a long line of cases that have stretched the buyer-seller doctrine too far and deviated from the standard set in *Direct Sales*. These cases originate from our decision in *United States v. Colon*, 549 F.3d 565 (7th Cir. 2008). In *Colon*, we concluded that repeated, distribution-quantity transactions alone could not support a conspiracy

conviction and instead required the presence of additional evidence, such as sales on credit or an agreement between the buyer and seller to warn of future threats to each other's business. *Id.* at 568–70. But that conclusion rested on the same arguments made by the defendant in *Direct Sales* that the Supreme Court squarely rejected. For instance, we analogized sales of cocaine to innocent purchases made at one's local Wal-Mart: "If you buy from Wal-Mart your transactions will be highly regular and utterly standardized, but there will be no mutual trust suggestive of a relationship other than that of buyer and seller." *Id.* at 568. That analogy flies in the face of *Direct Sales* and the critical difference discussed above between innocent purchases at one's local store compared to repeat, distribution-quantity transactions of illicit substances: the "mutual trust" not present in a transaction with Wal-Mart is undoubtedly found between the parties to an illicit transaction. *Colon* thus erred at the outset, resulting in a holding that has tainted our conspiracy and buyer-seller law.

*Colon* also stressed the practical reasons for not conflating a mere sale with a conspiracy. See *id.* at 569 (emphasizing that there needs to be evidence of an agreement to commit a crime other than evidence of the illegal transaction itself). No doubt, a mere buyer of drugs does not, without more, engage in a drug distribution conspiracy with a seller. Our holding does not change that basic principle. But today, we refine what "more" can transform a mere buyer-seller relationship into such a conspiracy. Repeated, distribution-quantity transactions of illegal drugs do not reflect a mere buyer-seller relationship between the parties. The buyer-seller defense was never meant for such a wholesale-level relationship. Cf. *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc) ("The buyer-seller exception prevents a single buy-sell

agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs. The rule shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for distributers.").

*Colon* and its progeny are now overruled to the extent that they are inconsistent with this opinion. See, e.g., *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015); *United States v. Brown*, 726 F.3d 993, 999 (7th Cir. 2013); *United States v. Johnson*, 592 F.3d 749, 755–56 (7th Cir. 2010). This brings us in harmony with our sister circuits. See, e.g., *United States v. Mitchell*, 596 F.3d 18, 25 (1st Cir. 2010) (rejecting the argument that a buyer-seller instruction was required because "the evidence at trial showed that Mitchell was involved in multiple transactions, for large, kilogram-quantities of cocaine, for large sums of money"); *United States v. Siegler*, 990 F.3d 331, 338 (4th Cir. 2021) ("We have repeatedly recognized that evidence of a single buy-sell transaction involving a 'substantial quantity of drugs' can support a 'reasonable inference' of knowing participation in a distribution conspiracy.") (quotation omitted); *Delgado*, 672 F.3d at 333 (Fifth Circuit concluding that the buyer-seller exception prevents a "single buy-sell agreement," not transactions in wholesale quantities); *United States v. Mosley*, 53 F.4th 947, 957 (6th Cir. 2022) ("[K]nowing entry into a drug conspiracy may reasonably be inferred when a buyer repeatedly purchases large quantities of drugs from a single seller.") (cleaned up); *United States v. Davis*, 867 F.3d 1021, 1034 (8th Cir. 2017) ("Eighth Circuit law is clear: '[E]vidence of multiple sales of resale quantities of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute.'") (quotation omitted) (alteration in original);

*United States v. Ivy*, 83 F.3d 1266, 1285–86 (10th Cir. 1996) ("[T]he purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy."); *United States v. Brown*, 587 F.3d 1082, 1090 (11th Cir. 2009) ("[D]ue to the repeated nature of the transactions and the large quantities involved, a rational trier of fact could infer a corresponding conspiracy to distribute the cocaine."); *United States v. McGill*, 815 F.3d 846, 929 (D.C. Cir. 2016) ("Evidence that Simmons facilitated multiple transactions of wholesale drug quantities 'permits an inference that [he] had knowledge of the conspiracy and intended to join.'") (quotation omitted) (alteration in original).

In sum, evidence of repeated, distribution-quantity transactions of illegal drugs between two parties, on its own, can sufficiently sustain a drug conspiracy conviction, consistent with the holding in *Direct Sales*. Though additional evidence is no longer required to defeat a sufficiency-of-the-evidence challenge in this context, see *Johnson*, 592 F.3d at 755–56 (citing *Colon* and listing examples of additional evidentiary factors needed to sustain a conspiracy conviction despite the presence of repeated, distribution-quantity drug transactions), our holding does not affect the government's ability to offer such additional evidence (which, as discussed below, it did here) to prove a conspiracy. Further, this additional evidence may be required in other conspiracy cases where evidence of repeated, distribution-quantity drug transactions is lacking.

In this case, the government proved that Page met with Hamlin hundreds of times over the course of a year (at a clip of approximately three times a week) to purchase distribution

quantities of heroin. That evidence alone supports a rational jury's finding that Page and Hamlin entered into an agreement, at least implicitly, to distribute drugs. Therefore, Page's conspiracy conviction must stand.

B

Though Page's challenge to his conviction fails under the proper conspiracy standard outlined above, we would sustain his conviction even under our now-overruled cases where we improperly held that repeated, distribution-quantity drug sales could not alone support a conspiracy. In those cases, we often turned to our list of additional, nonexhaustive evidentiary factors referenced above to help distinguish buyer-seller relationships from conspiracies: "sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities." *Johnson*, 592 F.3d at 755–56. And evidence showing a level of heightened trust likewise favors a conspiracy finding. *United States v. Vizcarra-Millan*, 15 F.4th 473, 507 (7th Cir. 2021). While these additional factors are instructive, our ultimate inquiry was always a holistic assessment of whether the jury reached a reasonable verdict. *Hidalgo-Sanchez*, 29 F.4th at 925. Stated differently, we ask whether a conspiracy existed under the totality of the circumstances. *Id.*

The evidence of conspiracy in this case consisted of much more than just repeated, distribution-quantity drug transactions. First, Page and Hamlin maintained a relationship akin to that of an uncle and a nephew, and they had a general trust

in one another. Second, as evidenced by several phone calls, Hamlin advised Page on his drug distribution, in part by recommending that Page not work with specific individuals, and acknowledged an especially cooperative business relationship with Page. In particular, because Page distributed heroin at such a fast pace, Hamlin gave him the benefit of a lower price per gram. Such a benefit reflects Hamlin and Page's understanding that Hamlin's short-term revenue losses would ultimately be usurped by larger profits stemming from Page's stable, high-volume drug distribution. Third, Page and Hamlin consistently notified each other about the status of their drug supply and their clientele. Fourth, Page and Hamlin contemplated expanding their business relationship "up north," and Page, at least at first, enthusiastically supported the idea. Though they ultimately did not agree to expand the business, a rational jury could certainly rely on this evidence to infer that Page and Hamlin had an underlying, implicit agreement to distribute drugs together—otherwise, there would be no business relationship to expand "up north." Fifth, Page and Hamlin exhibited a shared interest in delivering high-quality heroin to Page's customers, with Hamlin allowing Page to swap out a bad batch of heroin intended for a valuable, high-paying customer. And finally, on at least one occasion, Page purchased heroin partially on credit, which coupled with the other evidence above, is strong evidence of a conspiracy.

This evidence is overwhelming and indicative of an implied agreement between Page and Hamlin to distribute heroin together. A rational trier of fact could have easily convicted Page of conspiracy based on this record, which included much more than just evidence of repeated, distribution-quantity drug sales.

III

Page also argues that the district court erred by not sua
sponte giving a buyer-seller instruction to the jury. Page did
not request a buyer-seller instruction at trial, and when the
district court asked Page's counsel if the proposed final jury
instructions were sufficient, counsel responded affirmatively.
While Page possibly waived all challenges to the jury instruc-
tions, thus precluding our appellate review, we assume with-
out deciding that Page merely forfeited his request for the
buyer-seller instruction. *United States v. Leal*, 72 F.4th 262, 266
(7th Cir. 2023) (noting that a response of "no objection" dur-
ing a jury instruction conference results in forfeiture but de-
scribing tension in our case law on the issue). We review
Page's forfeited jury instruction request for plain error under
Federal Rule of Criminal Procedure 52(b). See *Greer v. United
States*, 593 U.S. 503, 507–08 (2021). As discussed above, Page's
case did not warrant a buyer-seller instruction. Nevertheless,
we take this opportunity to clarify what is required for us to
find plain error.

The Supreme Court laid out the test for plain error in
*United States v. Olano*, 507 U.S. 725 (1993), which it has reaf-
firmed time and again, most recently in *Greer*. "To establish
eligibility for plain-error relief, a defendant must satisfy three
threshold requirements": (1) "there must be an error"; (2) "the
error must be plain"; and (3) "the error must affect 'substan-
tial rights,' which generally means that there must be 'a rea-
sonable probability that, but for the error, the outcome of the
proceeding would have been different.'" *Greer*, 593 U.S. at
507–08 (quotation omitted). If those three elements are met,
an appellate court must consider a fourth discretionary ele-
ment: the court may grant plain error relief only if it concludes

that "the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 508 (quotation omitted). The defendant faces a "difficult" burden in seeking to establish all four elements needed for plain error. *Id.* Under this test, Page's claim of error fails.

## A

For plain error to lie, there must first be an error. A deviation from a legal rule is error unless the rule has been affirmatively waived. See *Olano*, 507 U.S. at 732–33. Page faces several obstacles in trying to meet this element.

First, for the reasons outlined in the previous section, the evidence in this case, even under our now-overruled precedent, supported a conspiracy rather than a buyer-seller relationship. Therefore, a buyer-seller instruction was not appropriate.

Second, a buyer-seller instruction would have contravened Page's theory of defense. Throughout the trial, Page painted Hamlin, the government's chief witness, as a liar to undermine any testimony that identified him as the individual on the other side of Hamlin's wiretapped phone calls. Page also suggested that his meetings with Hamlin were innocent encounters between family friends. In doing so, Page wisely tried to show that he was not involved in the drug trade at all so that the jury would acquit him of all charges (and not just the conspiracy charge). A buyer-seller defense would have done Page no good on 12 of his 13 counts (the attempt to distribute counts) and would have contradicted his position on those counts. Moreover, Page conceded at oral argument that he did not present a buyer-seller defense at trial. Oral Argument at 3:13 ("He did not present a buyer-seller

theory. That—I fully admit to that. We concede that."). Thus, because "we have repeatedly held that a buyer-seller instruction is unnecessary where the instruction would contradict the defendant's theory of the case," *United States v. Love*, 706 F.3d 832, 839 (7th Cir. 2013), Page's claim of error fails for this reason too.

Third, Page's case presents an odd procedural question: whether there is ever error when a district court does not sua sponte give an instruction on a defense theory that a defendant did not request. We conclude there is not. "In our adversarial system of adjudication, we follow the principle of party presentation," and "in both civil and criminal cases, … we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quotation omitted); see also *id.* at 375–76 ("[A]s a general rule, our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.") (cleaned up). Courts therefore "do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *Id.* at 376 (cleaned up). In the criminal context, departures from the party presentation principle are more common, albeit marginally, most often to protect a pro se litigant's rights. See *id.* at 375.

A district court does not err, let alone plainly err, by not sua sponte instructing the jury on a potential defense, particularly when the defendant is represented by counsel. The onus is not on the district court to devise and proffer such

defense theories. And as was the case with Page, there are often strategic reasons for defense counsel's decision to avoid presenting a particular theory. A theory of defense, like the buyer-seller defense, see, e.g., *United States v. Douglas*, 818 F.2d 1317, 1322–23 (7th Cir. 1987) (discussing defendant's proposed instruction on the "buyer-seller theory of defense"), is only injected into a criminal proceeding through the defendant's case presentation, unlike, for instance, the elements of an offense, which are injected via an indictment. Thus, it is the defendant's obligation to seek an instruction on said defense, and a district court does not err by not giving such an instruction on its own initiative.

Our sister circuits agree with this view. See, e.g., *United States v. Sago*, 74 F.4th 1152, 1160 n.6 (10th Cir. 2023) ("We are not alone in requiring this of defendants. Of the circuits to have considered a claim regarding an unrequested affirmative-defense instruction, most hold there is no error.") (collecting cases); *United States v. Tyson*, 653 F.3d 192, 212 (3d Cir. 2011) (finding no error in failing to give instruction on defense to firearms charge when defendant did not request it, even though "evidence arguably would have supported a[n] … instruction [on the defense]," because this may have been part of the defendant's strategy, and "[i]t is not for the district court to sua sponte determine which defenses are appropriate under the circumstances"); see also 1 Paul H. Robinson & Catherine Palo, *Criminal Law Defenses* § 68.50 (1984 ed. & Supp. 2023) ("[T]rial courts should not interfere with a defendant's chosen defense theory by giving an instruction which neither party requested and which may undermine defendant's chosen theory. Moreover, trial courts are not required to provide instructions for every possible theory of defense just because some supporting evidence may be

produced at trial, if the defendant has not relied on the particular defense theory.").

Because Page conceded that he did not seek a buyer-seller instruction at conference, the district court did not err by not inserting that instruction. And even if Page had requested the instruction at conference, the district court would not have erred in declining to give it. Page conceded that he did not present a buyer-seller defense during trial, and no evidence supported the instruction. To the extent Page suggests that he injected the buyer-seller defense into the case when he alluded to it during his closing argument, we are not convinced in light of Federal Rule of Criminal Procedure 30. Under Rule 30, a party seeking an instruction "must" make its request "at the close of evidence or at any earlier time," and the court "must inform the parties before closing arguments how it intends to rule on the requested instructions." Fed. R. Crim. P. 30(a)–(b). Thus, a party does not properly inject a defense into a criminal proceeding solely by introducing it during closing argument. For all these reasons, the district court committed no error.

B

Even assuming error, the second element of the plain error inquiry requires that the error be "plain." The Supreme Court has described this prong as "synonymous with 'clear' or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 734 (quotation omitted); see also *United States v. Frady*, 456 U.S. 152, 163 (1982) (noting that relief under Federal Rule of Criminal Procedure 52 requires "error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it"). An error that is

"subject to reasonable dispute" is not "plain." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

An error (had it existed) in not sua sponte instructing the jury on the buyer-seller defense would not have been plain. Page did not present this defense theory, and the evidence of conspiracy was very strong. Nothing about this record would have made it obvious to the district court that such an instruction was needed. We need not belabor these points again here. Instead, we take this opportunity to emphasize the need to ensure that an error is indeed plain before reversing a district court's judgment. In doing so, we clarify that some of our opinions have not placed sufficient emphasis on the rigorousness of the plain error standard of review.

Consider our recent opinion in *United States v. Anderson*, 99 F.4th 1106 (7th Cir. 2024). That case turned on whether the defendant's 2001 conviction for assault in Florida qualified as a predicate offense under the Armed Career Criminal Act (ACCA). *Id.* at 1110. Specifically, the issue was whether assault under Florida law criminalized reckless conduct—if it did, it would not qualify as an ACCA predicate. The Eleventh Circuit was presented with this identical question. It certified the question to the Florida Supreme Court, and we likewise held our appeal in abeyance pending that decision. See *Somers v. United States*, 355 So. 3d 887, 888 (Fla. 2022). The Florida Supreme Court concluded that assault under Florida law did not criminalize reckless conduct, see *id.* at 892–93, and the Eleventh Circuit, upon receiving answers to its certified questions, held that an assault conviction in Florida qualifies as an ACCA predicate, *Somers v. United States*, 66 F.4th 890, 892 (11th Cir. 2023).

In *Anderson*, we endeavored to review the district court's ACCA enhancement based on a Florida assault conviction for plain error because "Anderson did not contest his ACCA designation in the district court." 99 F.4th at 1110. Yet, our review effectively addressed the issue de novo in reversing the district court. We pointed to intermediate appellate decisions from Florida, concluded that the Florida Supreme Court's decision in *Somers* did not apply retroactively, and applied the reasonable probability test to hold that Anderson's assault conviction did not qualify as an ACCA predicate. We found that the district court erred in applying ACCA's 15 year minimum floor to Anderson's sentence, *id.* at 1114, but we did not explain how this error was clear or obvious. *Anderson* instead acknowledged that "[t]he breadth of the Florida aggravated assault statute at the time of Anderson's conviction is not easily discerned" and that the case was a "close" one. *Id.* at 1111–12. Any error was "subject to reasonable dispute," *Puckett*, 556 U.S. at 135, as our majority opinion needed to distinguish a Florida Supreme Court decision on point and created a split with the Eleventh Circuit on an identical question. Therefore, any error in *Anderson* was not plain.

A standard of review is not to be invoked in name only and then disregarded. It is a limiting principle on our scope of review that properly gives deference to a district court and the arguments the parties made before it. Simply, it keeps an appeal from turning into a full retrial. For there to be plain error, a court must give due weight to all four prongs set out in *Olano*. *Anderson*, and opinions like it, would turn out differently under a proper application of this standard.

C

If a defendant establishes the existence of a plain error, he must still show that the error affected his substantial rights—that a reasonable probability exists that, but for the error, the outcome of the proceedings would have been different. Under this prong, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Olano*, 507 U.S. at 734. In other words, a defendant claiming that a plain error affected his substantial rights must "make such an argument or representation on appeal." *Greer*, 593 U.S. at 509.

Page did not and could not have met this burden. Even if the district court's failure to sua sponte instruct the jury on the buyer-seller relationship constituted plain error, nothing in this record suggests that the outcome of the trial would have differed. As discussed above, this was not a close case; the evidence did not support a buyer-seller relationship. Moreover, the district court did more than simply instruct the jury on the elements of conspiracy. It also provided other instructions on when a defendant qualifies—and does not qualify—as a member of a conspiracy. In short, a jury would have convicted Page even with a buyer-seller instruction in hand.

D

"Rule 52(b) is permissive, not mandatory." *Olano*, 507 U.S. at 735. Thus, even if a defendant meets the first three threshold elements of plain error, we may grant relief, in our discretion, only if the error had a serious effect on the fairness, integrity, or public reputation of judicial proceedings. This requirement is distinct from the substantial rights prong: "a

plain error affecting substantial rights does not, without more," satisfy the fourth prong of plain error, "for otherwise the discretion afforded by Rule 52(b) would be illusory." *Id.* at 737. The fourth prong of *Olano* "inherently requires 'a case-specific and fact-intensive' inquiry." *Rosales-Mireles v. United States*, 585 U.S. 129, 142 (2018) (quotation omitted). In cases where a finding of plain error would result in additional jury proceedings on remand, the Supreme Court has suggested that an appellate court's discretion under the fourth prong of *Olano* should be exercised "sparingly" and "reserved for 'exceptional circumstances.'" See *id.* at 142–43 (quotations omitted).

We would decline to exercise our discretion under the fourth *Olano* prong. A finding of plain error here would require a wholly new jury trial based on an omitted jury instruction, cf. *Jones v. United States*, 527 U.S. 373, 389–94 (1999) (finding no plain error for purportedly erroneous jury instructions), even though Page never asked for the instruction, did not present a defense consistent with the instruction, and affirmatively approved the final jury instructions as written. Such an error would not affect the fairness, integrity, or reputation of our judicial system.

AFFIRMED

EASTERBROOK, *Circuit Judge*, concurring. I join the majority's opinion and add a few words about the relation between the party-presentation principle, see *United States v. Sineneng-Smith*, 590 U.S. 371 (2020), and plain-error review under Fed. R. Crim. P. 52(b).

*Sineneng-Smith* tells us that courts generally should not, and often *must* not, inject issues into litigation. Judges should instead respect the choices made by litigants and their lawyers about which issues to pursue and which to avoid. If lawyers for criminal defendants handle this task poorly, and prejudice ensues, a court might find that the defendant suffered from ineffective assistance of counsel. But that possibility is for collateral review rather than direct appeal. *Massaro v. United States*, 538 U.S. 500 (2003).

Subjects within the discretion of counsel in criminal cases include selection of a theory of defense and the decision whether to assert an affirmative defense, such as duress, self-defense, entrapment, or advice of counsel. Many defenses open the accused to some kind of risk, and counsel must evaluate whether the potential reward justifies that risk. Consider entrapment. "[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense." *Sorrells v. United States*, 287 U.S. 435, 451–52 (1932). Many lawyers view "I didn't do it" and "I was entrapped into doing it" as so incompatible that making both contentions amounts to a confession of culpability. A defendant is free to take that risk, see *Mathews v. United States*, 485

U.S. 58 (1988), but it is not one that a judge may thrust upon him.

The same is true when the tactic is in the nature of avoidance or mitigation. See *Keeble v. United States*, 412 U.S. 205, 212–13 (1973) (observing that a lesser-included-offense instruction can reduce the chance of acquittal). A buyer-seller argument poses risks to any defendant charged with both conspiracy and substantive crimes. Arguing that "I didn't do it" yet "I was just a buyer of illegal drugs" makes the defense position inconsistent and creates a risk that jurors may become skeptical about *both* halves of the either/or proposition. That sort of risk is apparent in Page's case, as he denied that he had anything to do with heroin and depicted Hamlin as a liar. Arguing that he just bought heroin in spot transactions with Hamlin could have helped Page against the conspiracy charge but would have increased the chance of conviction on the substantive charges. Because the Sentencing Guidelines link their recommendations to the quantity of drugs included as relevant conduct under U.S.S.G. §1B1.3, without adding levels for a conspiracy conviction, see U.S.S.G. §2D1.1 and Application Note 5; §2X1.1(a), trying to avert a conspiracy conviction while increasing the chance of substantive convictions would have incurred a substantial risk for little if any reward. An accused is free to take that risk, see *United States v. Cruse*, 805 F.3d 795, 815 (7th Cir. 2015), but the choice is one for the defense rather than the judge.

As far as I can tell, the Supreme Court has never held that a district judge must, should, or even may raise a contention such as a buyer-seller argument (or any other matter in defense, avoidance, or mitigation) when the accused does not request an instruction on that subject. That is the party-

presentation principle in action. Applied to this case, it means that the district judge did not err in omitting a buyer-seller instruction—indeed, that the judge would have erred by including one.

What, then, is the role of plain-error review under Rule 52(b)? It is to permit appellate review of errors affecting subjects that the parties *did* present, even if no one called a blunder to the court's attention. When a party proffers evidence, the judge must decide whether it is admissible; a plain error can be reviewed under Fed. R. Evid. 103(e). And the indictment in a criminal case necessarily requires the judge to craft an accurate charge on the elements of the offense. A bad elements instruction may be called plain error, consistent with the party-presentation principle, because the prosecutor made the elements of the crime an issue.

But Page does not contend that the judge misinstructed the jury on the elements of conspiracy under 21 U.S.C. §846. All a prosecutor need prove is agreement to engage in unlawful drug transactions, with intent to advance the agreement's object. See *United States v. Shabani*, 513 U.S. 10 (1994). The judge told the jury exactly that, following Instruction 5.08(B) of the *William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit* (2023 ed.). A buyer-seller instruction just restates the elements instruction from the defense's perspective. See Instruction 5.10(A). (This is why it is a theory of defense rather than an affirmative defense.) Page did not request any alteration of the elements instruction and, to the contrary, told the judge that all of the instructions were correct. That left no work for Rule 52(b) to do on the subjects that the prosecutor brought to the case, and no work at all to do on other subjects that the defense did *not* bring to the case.

Once convicted on the substantive counts, a defendant's risk/reward calculus for a buyer-seller instruction looks favorable, but the decision whether to request such an instruction must be made at trial rather than with the benefit of hindsight. Raising a buyer-seller issue for the first time after conviction is too late, because there is no error to address.

JACKSON-AKIWUMI, *Circuit Judge,* joined by ROVNER and LEE, *Circuit Judges*, dissenting. Today we revisit two well-worn questions under our conspiracy law. First, what evidence is sufficient to distinguish between a buyer-seller relationship and a conspiracy to distribute drugs? Second, can a district court plainly err by failing to give a buyer-seller instruction when a defendant doesn't request one?

On the first question, my colleagues in the majority conclude that evidence of repeat, distribution-sized drug transactions alone can prove conspiracy. They claim to restore our law to the rule articulated by the Supreme Court in *Direct Sales Co. v. United States*[1] because, they contend, a shift in interpretation ushered in by *United States v. Colon*[2] threw our circuit offtrack. I do not see restoration but reinvention.

*Direct Sales*—and every decision on the matter our circuit has issued since then—holds that repeat drug deals, even in significant quantities, may establish *knowledge* of a conspiracy, but they aren't enough by themselves to sustain a conspiracy conviction. The law has always required more—specifically, proof of *intent* to join the conspiracy. The majority's approach erases the critical element of intent, effectively collapsing the lines between drug distribution, aiding and abetting a drug distribution conspiracy, and conspiracy to distribute drugs.

Worse still are the silences today's decision offers. There is silence about the complete *consistency* of our pre- and post-*Colon* precedent, including our 30-year-old en banc decision

---

[1] 319 U.S. 703 (1943).

[2] 549 F.3d 565 (7th Cir. 2008).

squarely addressing today's issue, *United States v. Lechuga*.[3] These prior decisions all hold that large, repeat drug transactions are not enough to sustain a conspiracy conviction. The majority does not cite—nor have I found—a single decision by a panel of this circuit holding that repeat, distribution-quantity drug transactions alone can sustain a conspiracy conviction. There is silence on any justification (much less a compelling one) for not only explicitly overturning *Colon* and its progeny, but also implicitly overturning *Lechuga*. And there is silence on the significant due process concerns today's decision introduces.

On the second question before our court, I cannot agree with the majority. The law is clear: a district court can plainly err by failing to give a buyer-seller instruction, even when a defendant doesn't request one.

Below, I address these two questions in Parts I and II, respectively. In Part III, compelled by the majority's unusual detour, I pause to address an unrelated case. I conclude in Part IV. In short, because this new order of the day upends our circuit's conspiracy jurisprudence, I dissent.

# I

## Page's Sufficiency-of-the-Evidence Challenge

A jury convicted Royel Page of twelve counts of attempting to distribute and to possess with intent to distribute heroin, plus one count of conspiracy to distribute heroin. On appeal, Page seeks to overturn only the conspiracy conviction. My colleagues in the majority affirm the conspiracy conviction, concluding that evidence of repeat, distribution-sized

---

[3] 994 F.2d 346 (7th Cir. 1993) (en banc), *cert. denied*, 510 U.S. 982 (1993).

drug transactions are a sufficient basis for that conviction. I
see things differently.

In Part A, I walk through our circuit's jurisprudence on
drug distribution conspiracies—at least as it stood before to-
day's ruling. In this section, I first outline the *actus reus* and
*mens rea* elements of a drug distribution conspiracy crime. I
then discuss the *mens rea* element's distinct knowledge and
intent requirements—the latter of which transforms a buyer-
seller relationship into a conspiratorial one. From there, I ad-
dress how our circuit law has always conformed with the
holding of *Direct Sales* that the illicit nature of goods, paired
with repeat and large-quantity transactions, may suffice to es-
tablish *knowledge* of a drug distribution conspiracy. And our
circuit law has always conformed with the instruction in *Di-
rect Sales* that "informed and interested cooperation, stimula-
tion, [or] instigation" must exist to establish *intent* to join the
conspiracy. 319 U.S. at 713. Even in *Colon*, I explain, our ad-
herence to *Direct Sales* remained beyond question.

In Part B, I detail how the majority veers off course with
its holding today. In this section, I begin by addressing the
majority's alarmist portrayal of our circuit's drug distribution
conspiracy jurisprudence. Yes, we have sometimes struggled
in articulating the precise factors that demonstrate the
informed and interested cooperation, stimulation, or
instigation needed to elevate a defendant's *mens rea* from
mere knowledge to intent; but we have never—*not once*—
abandoned *Direct Sales*' clear rule that the sale of illicit goods,
even in repeat and large quantities, cannot by itself establish
intent. I then turn to the majority's misreading of *Direct Sales*
and *Colon*, showing how its analysis diverges from those
precedents and, in doing so, effectively erases the intent

requirement and converts one crime—drug distribution and/or aiding and abetting a drug distribution conspiracy—into another: conspiracy to distribute drugs. Finally, I discuss important considerations the majority does not, including our strong presumption against overturning precedent without compelling justification; the majority's effective overturning of *Lechuga*, our 30-year-old en banc decision addressing the issue we opine on today; and the due process concerns that today's decision raises.

In Part C, I apply the law to the facts of this case, demonstrating that under the correct legal framework as it stood before today, Page is entitled to a buyer-seller instruction. The majority's claim otherwise does not hold together.

### A

### Our Drug Distribution Conspiracy Law—Before Today

To understand why the majority's decision charts a concerning new course, we must first understand our circuit's drug distribution conspiracy law before today.

The crime of engaging in a drug distribution conspiracy sits at the intersection of two distinct crimes: conspiracy and drug distribution. To prove conspiracy, the government must establish three elements: (1) that two or more individuals agreed to commit an unlawful act; (2) that the defendant was aware of the agreement; and (3) that the defendant intended to join that agreement.[4] *See* 21 U.S.C. § 846. To prove drug

---

[4] *See United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991) ("To join a conspiracy, then, is to join an agreement, rather than a group. It follows that to be a conspirator you must know of the agreement, *and must intend to join it*." (emphasis added) (internal citations omitted)).

distribution, the government must establish two elements: (1) that the defendant knowingly or intentionally distributed a controlled substance; and (2) that the substance distributed was, in fact, a controlled substance. *See* 21 U.S.C. § 841(a). These two crimes—conspiracy and drug distribution—address distinct wrongs, but when combined, they form the crime of drug distribution conspiracy.

Importantly, as I explain in Section A.1 below, both crimes involve agreements. Drug distribution typically involves buyer-seller agreements—agreements to exchange drugs for money (or something else of value). Conspiracy, by contrast, hinges on conspiratorial agreements—agreements to further distribute drugs. With agreements at issue in both crimes, and the crimes combining to form a third crime (drug distribution conspiracy), the line between the offenses can grow thin. The challenge lies in ensuring that buyer-seller relationships are not miscast as conspiracies.

*Direct Sales*, which I examine in depth in Section A.2 below, draws the necessary line. It ensures conspiracy charges remain distinct from other criminal charges by identifying intent as the defining feature of conspiracy. *Direct Sales* requires the government to prove that the defendant *intended* to join the conspiracy, not merely that he engaged in conduct consistent with the conspiracy's goals—like buying and selling drugs (drug distribution) or otherwise helping the drug distribution conspiracy succeed (aiding and abetting a drug distribution conspiracy). By demanding proof of intent to join, *Direct Sales* prevents individuals from being swept into conspiracy charges without the collective agreement that the crime of conspiracy requires.

Our circuit's drug distribution conspiracy jurisprudence, shaped by *Direct Sales*, reflects these distinctions. It requires proof of three elements: *actus reus* (two or more people agree to commit an unlawful act, namely further distributing drugs), knowledge of the conspiracy (often inferred from repeat purchases of drugs in large quantities), and intent to join the conspiracy (demonstrated by informed and interested cooperation). The latter two elements form the *mens rea* for drug distribution conspiracy. I explain this in detail in Section A.2 below.

With this foundation laid, I turn to a closer examination of *actus reus* and *mens rea* in drug distribution conspiracy cases. My goal, again, is to provide the framework for understanding precisely how the majority's change to our circuit law is unwarranted, inconsistent with *Direct Sales*, and much more.

### 1

### *Actus Reus*

When the government charges a drug seller or buyer with conspiracy to distribute drugs (instead of or in addition to a charge of drug distribution), we need to ask: what agreement does the government contend forms the basis of the conspiracy's *actus reus*? Remember: a drug sale is already an agreement to commit an unlawful act—specifically, drug distribution. The buyer and seller come together, negotiate terms, and exchange money or goods for drugs. *United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004). This is drug distribution—a straightforward buyer-seller transaction. But while this kind of transaction involves an agreement to distribute drugs, it cannot by itself also serve as the conspiratorial agreement necessary to support a drug distribution conspiracy conviction.

*Id.* ("[T]he government must prove that the defendant con-spired to commit some crime beyond *that* agreement."). To say otherwise would conflate a simple buyer-seller transac-tion with a broader drug distribution conspiracy. *See Lechuga*, 994 F.2d at 349 (requiring "proof of an agreement to commit a crime other than the crime that consists of the sale itself").[5] For this reason, we have consistently held that a conspiracy to distribute drugs demands something more at the *actus reus* stage—specifically, an agreement to *further* distribute drugs beyond the initial sale. *United States v. Smallwood*, 188 F.3d 905, 912 (7th Cir. 1999) (citing *Lechuga*, 994 F.2d at 349); *see also United States v. Shabani*, 513 U.S. 10, 16 (1994) (explaining that "the criminal agreement itself is the *actus reus*" in a conspiracy case). Although conspiratorial agreements can be inferred from circumstantial evidence, reliance on such evidence should not "obscure the basic fact that the agreement is the essential evil at which the crime of conspiracy is directed." *See Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975) (citing *Di-rect Sales*, 319 U.S. at 711–13).

## 2

### *Mens Rea*

As with *actus reus*, the government almost always turns to circumstantial evidence to establish the two separate *mens rea*

---

[5] While *Lechuga* generated six separate opinions, seven of the eleven judges agreed with Judge Posner's formulation of the distinction between a conspiratorial relationship and a buyer-seller relationship. *See United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th Cir. 2000) ("The lead opin-ion, which was joined by three judges, Judge Rovner's concurring opinion, *id.* at 357, and the dissenting opinion, *id.* at 357–64, also joined by three judges, agreed on this point. The lead opinion therefore establishes the holding of the case.").

requirements of knowledge and intent. *See id.* at 714. Two key Supreme Court cases—*United States v. Falcone*, 311 U.S. 205 (1940), and *Direct Sales*, 319 U.S. at 712–13—have long made clear that, even when the government relies on circumstantial evidence, knowledge of the conspiracy and intent to join the conspiracy remain essential elements of the drug distribution conspiracy crime.

In *Falcone*, the Supreme Court held that mere knowledge by the seller that the buyer intended to use the commodity unlawfully, without more, is not enough to support a conspiracy conviction. 311 U.S. at 210–11. In that case, wholesalers that regularly sold large quantities of sugar and yeast to bootleggers were not considered conspirators, despite knowing the illegal uses to which the products would be put. *Id*. at 210. The Court explained that knowledge of the unlawful end-use was insufficient; proof of intent to join the conspiracy was still required. *Id*. In short, *Falcone* insisted that the government go further—showing not only that the defendants knew about the illegal activity, but that they intentionally joined the agreement to further the illegal activity.[6] *Id.*

Three years later, in *Direct Sales*, the Supreme Court clarified what more is needed to transform knowledge into intent. Direct Sales was a drug manufacturer and wholesaler. *Direct Sales*, 319 U.S. at 704. The company sold morphine sulphate to a doctor in such large quantities, so frequently, and over such

---

[6] Of course, *knowledge* of the conspiracy, combined with the fact that a seller provides a buyer with the means to commit a further illegal act, might turn the seller into an aider and abettor of the buyer's future crime. *See Lechuga*, 994 F.2d at 349. But that knowledge is not enough to turn the seller into a co-conspirator. *Id.* More on aiding and abetting liability in a bit.

a long period that it must have known the doctor could not lawfully dispense the amounts received and was thus distributing the drug illegally. *Id.* at 705. The company also "actively stimulated" these purchases by employing a cost-saving mail order system that allowed it to offer lower prices than its competitors. *Id*. The Court reaffirmed *Falcone's* principle that mere knowledge of illegal use, without more, cannot establish conspiracy. *Id*. at 709. It then examined whether, considering the facts, the seller had both knowledge of the conspiracy and intent to join it. *Id*. at 711–14.

The first factor the *Direct Sales* Court considered was the nature of the merchandise. In *Falcone*, the commodities sold—sugar and yeast—were innocent in themselves, while in *Direct Sales*, the commodity was the restricted drug morphine. *Direct Sales*, 319 U.S. at 711–12. The Court considered the difference in the types of goods "important for two purposes." *Id.* at 711 "One is for making certain that the seller *knows* the buyer's intended illegal use. The other is to show that by the sale he *intends* to further, promote and cooperate in it." *Id.* (emphasis added).

How does the nature of the merchandise inform the knowledge requirement, according to *Direct Sales*? The restricted nature of a commodity "makes a difference in the *quantity of proof required* to show *knowledge* that the buyer will utilize the article unlawfully," *Direct Sales* explained. *Id.* at 712 (emphasis added). The Court added that "additional facts, such as quantity sales, high-pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or merely suspicious in relation to unrestricted goods, may furnish conclusive evidence, in

respect to restricted articles, that the seller *knows* the buyer has an illegal object and enterprise." *Id. (emphasis added).*

And how does the character of the merchandise inform the separate intent requirement? According to *Direct Sales*, the restricted nature of a commodity "has a *further bearing* upon the existence and the proof of *intent*." *Id*. (emphasis added). As *Direct Sales* explained, "[k]nowledge, equivocal and uncertain as to [unrestricted goods], becomes sure as to the other," and "[s]o far as knowledge is the foundation of intent, the latter thereby also becomes the *more secure*." *Id.* at 711–12 (emphasis added). "More secure," though, does not mean fully secure; so the *mens rea* analysis in *Direct Sales* did not end. As the Court acknowledged, "[n]ot every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." *Id.* at 712. This means sometimes, even where the evidence clearly establishes knowledge, it still falls short of proving intent. *Id.*

*Direct Sales* took pains to distinguish the analysis of knowledge from that of intent. *Id.* at 711 ("While [intent] is not identical with mere knowledge that another purposes unlawful action, it is not unrelated to such knowledge."). First, no evidence of knowledge means no intent, the Court said. *Id.* at 711–12 (stating that "knowledge is the foundation of intent" and "without the knowledge, the intent cannot exist" (citing *Falcone*, 311 U.S. 205)). Second, equivocal evidence of knowledge also means no intent. This is because "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning what, in [*Falcone*], was called a dragnet to draw in all substantive crimes." *Id.* (internal citations omitted). And third, definite evidence of knowledge can

still mean no intent. "There may be circumstances in which the evidence of knowledge [of unlawful activity] is clear," *Direct Sales* concluded, "yet the further step of finding the required intent [to join the unlawful activity] cannot be taken." *Id.* at 712.

So, *Direct Sales* moved past the character of the merchandise to examine a second factor: quantity and regularity. The Court concluded that sales of restricted goods occurring in significant "volume, frequency, and prolonged repetition," may suffice to establish knowledge, but that knowledge must still be "coupled" with the distinct and separate requirement of intent. *Direct Sales*, 319 U.S. at 714–15 (explaining the sales "would be wholly lawful transactions" "but for their volume, frequency and prolonged repetition, *coupled* with the seller's unlawful intent to further the buyer's project") (emphasis added); *see also id.* at 712 n.8, 712–13.

That brings me to the third factor *Direct Sales* considered: whether the evidence shows "informed and interested cooperation, stimulation, instigation." *Id.* at 713. The Court held that a conspiracy conviction may not lie even against a defendant engaged in "a more continuous course of sales, made either with strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase." *Id.* at 712 n.8. Unlike in *Falcone*, where the evidence fell short, the evidence in *Direct Sales* revealed the necessary stimulation or active incitement to purchase: there was evidence that the wholesaler tried to "stimulate" sales through quantity discounts, "high-pressure" mail solicitations, and changes to its order forms that encouraged more frequent purchases. *Id.* at 705–07, 712. With this evidence, the jury could conclude that the wholesaler intended by its efforts

to informedly and interestedly cooperate, stimulate, and instigate the drug distribution conspiracy. *See id.* at 712. Absent such actions, the evidence could not show intent—just "suspicion, knowledge, acquiescence, carelessness, indifference, [or] lack of concern."[7] *Id.*; *see also United States v. Gabriel*, 810 F.2d 627, 634 (7th Cir. 1987) ("The intent necessary to support a conviction for conspiracy … is 'more than knowledge, acquiescence, carelessness, indifference, lack of concern,' but rather is 'informed and interested cooperation, stimulation, instigation.'" (quoting *Direct Sales*, 319 U.S. at 713 (1943))).

Boiled down, *Direct Sales* and *Falcone* tell us that a jury may conclude that a defendant knowingly and intentionally joined a drug distribution conspiracy when three elements are present: the defendant (1) dealt in restricted goods, (2) in "high volume, frequency, and over a prolonged period," and (3) exhibited "informed and interested cooperation, stimulation, instigation." *Direct Sales*, 319 U.S. at 712–13. If the evidence shows only the first two things, knowledge may exist, but not necessarily intent. And without intent, there can be no conspiracy conviction. Our ruling in *United States v. Menting* sums up well how this circuit applies *Direct Sales*:

---

[7] *See also Direct Sales*, 319 U.S. at 712–13 ("But this is not to say that a seller of harmful restricted goods has license to sell in unlimited quantities, to stimulate such sales by all the high-pressure methods .… When the evidence discloses such a system, working in prolonged cooperation with a physician's unlawful purpose to supply him with his stock in trade for his illicit enterprise, there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible. The step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation.").

More than 55 years ago, the Supreme Court up-
held a conspiracy conviction in which the overt
acts consisted solely of "sales, which but for
their volume, frequency and prolonged repeti-
tion, coupled with the seller's unlawful intent to
further the buyer's project, would be wholly
lawful transactions." *Direct Sales Co. v. United
States*, 319 U.S. 703, 714–15, 63 S. Ct. 1265, 87
L.Ed. 1674 (1943). Following that guidance, this
court has looked for evidence of "*a prolonged and
actively pursued course of sales* coupled with the
seller's knowledge of and a shared stake in the
buyer's illegal venture" in order to distinguish
a conspiracy from a simple buyer-seller rela-
tionship. *United States v. Pearson*, 113 F.3d 758,
761 (7th Cir. 1997) (citation omitted). *Other im-
portant indicia of conspiracy include "the length of
affiliation, the established method of payment[,] …
the extent to which the transactions are standard-
ized, and the demonstrated level of mutual trust."
Id.*[8]

---

[8] Another useful summary comes from our decision in *United States v. Clay*, in which we reasoned:

Although the nub of a conspiracy is an agreement, a sim-
ple agreement between a buyer and seller to exchange
something of value for cocaine cannot alone constitute a
conspiracy because such an agreement is itself the sub-
stantive crime. *See United States v. Lechuga*, 994 F.2d 346,
349 (7th Cir. 1993) (en banc); *see also United States v.
Kozinski*, 16 F.3d 795, 808 (7th Cir. 1994). The 'something

more' that is necessary for the existence of a true drug distribution conspiracy is a further understanding between the buyer and seller, often implicit, that usually relates to the subsequent distribution of the narcotics …. Just how implicit that understanding can be to sustain a conspiracy, and how circumstantial the proof of it will typically be, was demonstrated in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943).…

The Court noted that the knowledge alone that one is supplying inputs to another's illicit business cannot support a finding of conspiracy. But knowledge is sometimes accompanied by an intent to further or cooperate in the secondary endeavor .…

What sort of evidence will allow … a trier of fact to make the inference that buyer and seller are dealing not just with disinterested eyes narrowly focused on the purchase at hand but with a mutual understanding about subsequent distribution? *Direct Sales* indicates that a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture is sufficient to sustain a finding of conspiracy.… Many things will inform this question of degree; for example the length of the affiliation, the established method of payment, the available supplying or marketing alternatives, the extent to which the transactions are standardized, and the demonstrated level of mutual trust.…. No one of these, or other, circumstantial factors will typically be dispositive because each is only an imperfect indicant of whether a true conspiracy existed. If enough point in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals themselves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture."

166 F.3d 923, 928 (7th Cir. 1999) (emphasis added).

In the 90 years since *Direct Sales*, our caselaw has built a framework for determining when a buyer-seller relationship crosses the line into a conspiracy. That framework focuses on whether the relationship involves "a prolonged and actively pursued course of sales," *Pearson*, 113 F.3d at 761—or, as *Direct Sales* put it, "informed and interested cooperation, stimulation, instigation," 319 U.S. at 712—which can be "coupled with the seller's knowledge of and shared stake in the buyer's illegal venture," *Pearson*, 113 F.3d at 761, to establish a drug distribution conspiracy. The "[f]actors that bear on that assessment," *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001), have repeatedly surfaced in our decisions:

- *United States v. Sergio*, 934 F.2d 875, 877, 879 (7th Cir. 1991) (affirming drug conspiracy conviction based on "large quantities," "regular shipments," and "fronting," among other things);

- *United States v. Thompson*, 944 F.2d 1331, 1342–43 (7th Cir. 1991) (affirming based on "large quantities," "number of transactions," and fact that buyers "picked up [] cash from [] couriers and in turn arranged to have other couriers drive cocaine to Milwaukee where [the seller] would receive it");

- *United States v. Severson*, 3 F.3d 1005, 1010 (7th Cir. 1993) (affirming based on "several" purchases of "marijuana packaged in Ziploc bags" and "fronting");

- *United States v. Dortch*, 5 F.3d 1056, 1065 (7th Cir. 1993) (affirming based on "three sales" of "distributable amounts,"

---

37 F.3d 338, 341–42 (7th Cir. 1994).

"one of which included 'fronted' cocaine," and discussing factors);

- *United States v. Cabello*, 16 F.3d 179, 182 (7th Cir. 1994) (affirming based on "prolonged cooperation" and "fronting" on a "highly regular basis");

- *United States v. Zarnes*, 33 F.3d 1454, 1465–68 (7th Cir. 1994) (affirming based on transaction frequency, standardized dealings, and "fronting," among other things, and discussing factors);

- *United States v. Ferguson*, 35 F.3d 327, 331 (7th Cir. 1994) (affirming based on transaction frequency, transaction size, and "fronting");

- *United States v. Clay*, 37 F.3d 338, 342–43 (7th Cir. 1994) (affirming based on "regular purchases," transaction size, and "fronting," among other things);

- *United States v. Penny*, 60 F.3d 1257, 1259, 1263 (7th Cir. 1995) (affirming based on "numerous transactions," "large quantities," and "fronting");

- *United States v. Larkins*, 83 F.3d 162, 166 (7th Cir. 1996) (affirming based on "kilogram quantities" and credit sales);

- *United States v. Pearson*, 113 F.3d 758, 761 (7th Cir. 1997) (discussing the Seventh Circuit "refin[ing] [its] calculus" "[o]ver the years" on "identify[ing] a few factors more relevant than others in determining whether a conspiracy existed" and affirming conspiracy conviction based on large, monthly, and standardized drug transactions, and the fact that "[the buyers] paid many thousands of dollars for the drugs and then went shopping before actually receiving the cocaine");

• *United States v. Berry*, 133 F.3d 1020, 1023 (7th Cir. 1998) (affirming because "buying and selling of crack occurred between Berry and Vinson" and "Vinson provided security services, made runs, and packaged Berry's crack," as well as discussing factors);

• *United States v. Meyer*, 157 F.3d 1067, 1074–75 (7th Cir. 1998) (affirming based on "numerous drug transactions over a span of more than four years," "large quantities," and "consult[ing] his father [the co-conspirator] regarding drug buys");

• *United States v. Hach*, 162 F.3d 937, 943–44 (7th Cir. 1998) (affirming based on "frequent and repeated transactions," "amounts fit for more than personal consumption," standardized transactions, and credit sales, among other things, and discussing factors);

• *United States v. Smallwood*, 188 F.3d 905, 913 (7th Cir. 1999) (affirming based on frequent transactions, credit sales, discounted sales, and advice, among other things, and discussing factors);

• *United States v. Sanchez*, 251 F.3d 598, 602 (7th Cir. 2001) (affirming "[b]ased on th[e] evidence of repeat sales, the promise of future sales, standardized dealings, [] the level of trust between the parties," and "the quantity of drugs," and discussing factors);

• *United States v. Adkins*, 274 F.3d 444, 450–51 (7th Cir. 2001) (affirming based on "large quantities," standardized transactions, and credit sales, and discussing factors);

• *United States v. Haywood*, 324 F.3d 514, 517 (7th Cir. 2003) (affirming based on "larger quantities," transaction

frequency, and standardized transactions, and discussing factors);

- *United States v. Hicks*, 368 F.3d 801, 805–06 (7th Cir. 2004) (affirming based on "quantity of drugs," transaction frequency, standardized transactions, paying of "consult" fee, and "fronting," and discussing factors);

- *United States v. Suggs*, 374 F.3d 508, 518–19 (7th Cir. 2004) (affirming based on "large quantities," "long-term pattern of distribution," and "monitor[ing] the presence of police," and discussing factors);

- *United States v. Askew*, 403 F.3d 496, 502, 504 (7th Cir. 2005) (affirming based on "weekly sales of large quantities of PCP" and "fronting," and discussing factors);

- *United States v. Carrillo*, 435 F.3d 767, 776 (7th Cir. 2006) (affirming based on large quantities; repeat transactions; "fronting"; the buyer took cash from seller to pay rent on home where drugs were stored; the seller was listed on the lease; and, after a car stuffed with heroin had been seized by the DEA, the seller, through an attorney, attempted to claim the car, among other things, and discussing factors);

- *United States v. Eberhart*, 467 F.3d 659, 669 (7th Cir. 2006) (affirming based on "ample evidence that Eberhart dealt in large quantities of drugs, bought and sold drugs on credit, and cooperated with Bolden over a significant period of time," and discussing factors);

- *United States v. Fuller*, 532 F.3d 656, 662–63 (7th Cir. 2008) (affirming based on transactions "on a steady basis," "distribution amounts," standardized transactions, and "fronting," among other things, and discussing factors); and

- *United States v. Zaragoza*, 543 F.3d 943, 947–48 (7th Cir. 2008) (affirming based on "regular[]" purchases, standardized transactions, and "fronting," among other things, and discussing factors).

We decided *United States v. Colon* in due course, tweaking our existing list of factors. An earlier Seventh Circuit pattern jury instruction on buyer-seller relationships had outlined a set of factors drawn from our cases up to that point. 549 F.3d at 570–71. Those factors included: (1) whether the parties developed a standardized way of doing business over time; (2) the level of mutual trust between the buyer and seller; (3) whether the parties had a continuing relationship; (4) whether the seller had a financial stake in the buyer's resale; (5) whether there was an understanding that the goods would be resold; and (6) whether sales were made on credit or consignment. *Id.* at 570. *Colon* flagged a critical issue, however: only the last factor really distinguished conspiracies from buyer-seller relationships while the others were in fact consistent with both scenarios. *Id.*

To address that problem, *Colon* set aside the previous list in favor of a new one designed to more accurately distinguish between a conspiracy and a simple buyer-seller relationship. This updated, non-exhaustive list included: (1) sales made on credit or consignment; (2) an agreement to help find other customers; (3) payment of commissions on sales; (4) evidence that one party advised the other on how to conduct their business; and (5) an agreement to warn each other about threats to the business, whether from competitors or law enforcement. *Id.* at 570–71. As it turns out, all of these "new" factors had already made appearances in our pre-*Colon* caselaw.

And, since then, we have applied the factors as listed in *Colon*.[9]

Until today, our precedent—while perhaps not always polished at the edges when it comes to the "factors"—has nonetheless maintained a clear and consistent standard: repeat drug transactions, even those involving large quantities, do not establish the necessary intent to conspire. The government must do more than point to repeat, distribution-quantity sales; it must show "informed and interested cooperation, stimulation, instigation" in or of the broader drug distribution conspiracy. *Direct Sales*, 319 U.S. at 712. Without this showing of intent, there is no conspiracy.

**B**

**Our Drug Distribution Conspiracy Law—After Today**

The majority tells us that our long-held rule—requiring more than repeat, distribution-quantity drug transactions to sustain a drug conspiracy conviction—is yesterday's news.

---

[9] *See, e.g., United States v. Kincannon*, 567 F.3d 893, 897 (7th Cir. 2009); *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009); *United States v. Johnson*, 592 F.3d 749, 756 n.5 (7th Cir. 2010); *United States v. Rea*, 621 F.3d 595, 608 (7th Cir. 2010); *United States v. Villasenor*, 664 F.3d 673, 680 (7th Cir. 2011); *United States v. Vallar*, 635 F.3d 271, 286–87 (7th Cir. 2011); *United States v. Nunez*, 673 F.3d 661 (7th Cir. 2012); *United States v. Pulgar*, 789 F.3d 807, 812–13 (7th Cir. 2015); *United States v. Musgraves*, 831 F.3d 454, 462–63 (7th Cir. 2016); *United States v. Moreland*, 703 F.3d 976, 985 (7th Cir. 2012), *holding modified by United States v. Jett*, 908 F.3d 252 (7th Cir. 2018); *United States v. Maldonado*, 893 F.3d 480, 485 (7th Cir. 2018); *United States v. Neal*, 907 F.3d 511, 516 (7th Cir. 2018); *United States v. Brown*, 726 F.3d 993,1000 (7th Cir. 2013); *United States v. Vizcarra-Millan*, 15 F.4th 473, 510–11 (7th Cir. 2021).

In so declaring, the majority opinion begins by catastro-
phizing the state of our drug distribution conspiracy law,
painting a picture that distorts reality. It then misquotes and
misinterprets *Direct Sales* and *Colon*, effectively sidestepping
the specific intent requirement and transforming drug distri-
bution and/or liability for aiding and abetting a drug distri-
bution conspiracy into conspiring to distribute drugs. After
that, it falls silent, offering no salve for the serious due process
issues its holding creates; no comment on the lack of a com-
pelling reason to abandon our strong presumption against
overturning precedent; and no explanation for implicitly
overturning *Lechuga*, a longstanding en banc decision ad-
dressing the very same issue.

## 1

### The Majority Opinion Invents Inconsistency

### Where None Exists

The majority opinion opens with what might seem like a
small misstep. But that misstep, in truth, sets a foundation for
the great error to come—that is, eliminating the longstanding
intent requirement in drug distribution conspiracy cases.

The majority opinion begins with a sweeping critique of
our existing law, asserting that "[o]ur conspiracy and buyer-
seller jurisprudence has strayed far from the Supreme Court's
decision in *Direct Sales* …." *Ante*, at 2. To support this claim,
the majority cites *United States v. Brown*, 726 F.3d 993, 1000–01
(7th Cir. 2013), with a parenthetical stating that *Brown* "de-
scribe[d] the tension and inconsistency in our buyer-seller
case law." *Ante*, at 6.

But *Brown* doesn't do what the majority suggests. In fact,
*Brown* mentions *Direct Sales* three times, and none of those

mentions critique our precedent or suggest that we've devi-
ated from the Supreme Court's guidance. *Brown*, 726 F.3d at
998–99. Rather than fault our jurisprudence for straying from
*Direct Sales*, *Brown* acknowledges that our precedent has been
internally inconsistent—but only in a narrow respect: in artic-
ulating the precise factors needed to establish informed and
interested cooperation, stimulation, or instigation. *Id.* at 1001
("Admittedly, much of the confusion stems from our own im-
precision.").

Put differently, in *Brown*, our court recognized the need to
provide a clearer statement about the factors we consider
when deciding whether knowledge has become intent. 726
F.3d at 1001. Agreements come in infinite shapes and sizes,
*Brown* observes, and our list-of-factors approach to conspira-
cies must—and does—account for this variety. *Id*. at 1001–02.
The previous version of our pattern instruction on buyer-
seller relationships provided a list of factors, which *Colon*
simply updated, *Brown* explains. *Id*. at 998–99. Even though
"many of our cases do not state the legal standard in precisely
the same way," *Brown* notes that "most of them would have
reached the same outcome under each other's jurisprudence."
*Id*. at 1001–02. The key insight in *Brown* was that the con-
sistency of results across our cases, despite occasional differ-
ences in wording, suggested that we had been employing a
"totality of the circumstances" approach all along. *Id*. Thus,
the majority is wrong to frame *Brown* as a sweeping critique
of our drug distribution conspiracy precedent rather than a
case clarifying how the factors articulated in *Colon* were to be
applied.

The majority's framing lays the groundwork for the major shift its decision occasions: the quiet excision of the intent requirement from our drug distribution conspiracy law.

2

**The Majority Opinion Reinterprets *Direct Sales* and *Colon***

The majority next turns its attention to *Direct Sales* and *Colon*, distorting the reasoning in the two cases, and—in the end—effectively eliminating the intent requirement from our drug distribution conspiracy framework.

i.

I start with *Direct Sales*. The majority's treatment suffers from three flaws.

First, the majority misrepresents *Direct Sales* by suggesting that—where there's repeat, distribution-quantity transactions of goods—the illicit nature of the goods ends the analysis. According to the majority, "[t]he illegality of morphine [in *Direct Sales*], as compared to the legality of sugar and yeast [in *Falcone*], proved critical to sustaining *Direct Sales*'s conspiracy conviction for two reasons:" ensuring "the seller knows" and showing "[the seller] intends." *Ante*, at 8.

But *Direct Sales* never elevated the illegality of goods to a decisive factor in determining whether a defendant took part in a drug distribution conspiracy—even where there's large, repeat transactions. *Direct Sales*, in fact, explicitly rejected that rule. The *Direct Sales* Court described the restricted nature of morphine as "important for two purposes": providing some proof of knowledge and, separately, providing some proof of intent. 319 U.S. at 711. Specifically, *Direct Sales* explains that the legality of a good makes "a difference in the *quantity of*

*proof* required to show knowledge that the buyer will use the article unlawfully" and "[t]he difference in the commodities has a *further* bearing upon the existence and the proof of intent." *Id.* (emphasis added). *Direct Sales* goes on to explain that, though the illicit nature of goods can amount to conclusive proof of knowledge when sold in large quantities,[10] it does not constitute conclusive proof of intent. *Id.* at 712–13.

Far from making the illicit character of the goods dispositive, the Supreme Court treated it as just one consideration in assessing whether repeat, large-scale transactions can demonstrate the separate and distinct elements of knowledge and intent to conspire. By allowing the illicit nature of goods to shoulder more weight than *Direct Sales* permits, the majority opinion downplays, if not outright erases, *Direct Sales*'s clear line between knowledge and intent.

***

Second, the majority errs in its treatment of the second consideration in *Direct Sales*: quantity and frequency of transactions.

To start, the majority correctly observes that "facts such as 'quantity sales' or 'abnormal increases in the size of the buyer's purchases, … which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to

---

[10] *See Direct Sales*, 319 U.S. at 712 (holding that "additional facts, such as quantity sales, high-pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or merely suspicious in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller *knows* the buyer has an illegal object and enterprise" (emphasis added)).

restricted articles, that the seller *knows* the buyer has an illegal object and enterprise.'" *Ante*, at 9 (emphasis added). But what comes next is perplexing. The majority doubles back and asserts that repeat, distribution-sized transactions prove intent. This conclusion flatly contradicts its observation above. *Id.* Worse, it squarely conflicts with *Direct Sales*, which makes clear that even conclusive evidence of knowledge—like that inferred from sales in large quantities—does not, on its own, establish intent. *See Direct Sales*, 319 U.S. at 711–12.

Two, in an attempt to support its conclusion that drugs, repeat transactions, and large quantities suffice, the majority offers what it calls an "instructive" breakdown of the buyer-seller relationship in cases involving repeat, distribution-level drug sales. In doing so, however, the majority collapses two distinct legal concepts—conspiracy and aiding and abetting liability—into one.

The majority asserts that when a seller repeatedly supplies distribution-quantities of drugs, the seller inevitably realizes the buyer is reselling the drugs illegally. *Ante*, at 9. As the buyer's illegal distribution network expands, so does the seller's stake, creating what the majority calls a "codependent business relationship" where both parties have "shared stake in each other's success." *Id.* at 10. The more the buyer's customer base grows, the more the seller profits, which according to the majority solidifies the implicit agreement between the two to further distribute drugs. *Id.* at 9–10.

Not only does the conclusion that intent can be inferred from a combination of drugs, repeat transactions, and large quantities run headlong into *Direct Sales*, this very argument—conjuring a "codependent business relationship" and "shared stake in each other's success" based on repeat,

distribution-quantity drug transactions alone—was squarely rejected by this court in *Townsend*, more than a decade before *Colon*. In *Townsend*, the government contended that a seller who repeatedly engages in distribution-quantity drug deals with a known dealer must be aware that the buyer is connected to a broader drug distribution conspiracy. 924 F.2d at 1391–92. The government's logic in that case was that because both the buyer and seller benefited from these transactions, they each knowingly and intentionally joined the larger conspiracy. *Id.*

We rejected that reasoning, explaining: "Taken to its extreme, the government's logic suggests that anyone selling or buying drugs from any [] of these defendants could also have been convicted as a coconspirator." *Id.* at 1390. Here was our rejection in full:

> We think the government's argument stretches the boundaries of conspiracy law to the breaking point. We recognize that, by their very nature, drug conspiracies are loosely-knit ensembles.… [But] mere knowledge of the hub's activities, or those of the other spokes, is not enough to tie the conspiracy together.… Neither of these paradigms suffices … to show mutual support or interest among the component parts of the organizational construct. They don't eliminate the need to inquire directly into whether the defendants had a mutual interest in achieving the goal of the conspiracy .… "[I]t is … hard[] to tell just what agreement can reasonably be inferred from the purchase, even the repeated purchase, of contraband …." *Borelli*, 336 F.2d at 384. By

> definition, market transactions—whether in le-
> gal or illegal markets—benefit both parties, but
> we do not assume, *ab initio*, that they carry with
> them the excess baggage of conspiracy....[11]

*Id.* at 1391–92.

Indeed, as we further explained in *Townsend*, "we cannot say that every act of distribution taken by [the buyer], once [the seller] became involved with [the buyer], was in the furtherance of their conspiracy." *Id.* (quoting *United States v. North*, 900 F.2d 131, 134 (8th Cir. 1990)). Even if a seller admits that he *knew* the buyer resold drugs to others, one possibility is that those additional sales formed part of the buyer's *own* distribution operation—not the conspiracy's. *Id.* at 1393. Another possibility is that the buyer and seller may face liability

---

[11] Of course, "[w]e cannot [] reasonably assume that everyone with whom a drug dealer does business benefits, directly or indirectly, from his other drug deals. In fact, any inference should probably run in the other direction. There is—hard though it may be to believe—a finite supply of drugs. Those in the market to sell or buy large quantities (for distribution) are just as likely, if not more, to be competitors as collaborators." *Townsend*, 924 F.2d at 1393; *see also United States v. Thornton*, 972 F.2d 764, 769–70 (7th Cir. 1992) ("[A] conspiracy is essentially a business enterprise with illegal purposes that like a legal business enterprise is characterized by cooperative relationships between its members. And, … just like other commodities, there is a limited supply of drugs, meaning that if the government could pool all levels of a distribution chain into one conspiracy without providing some evidence that the members intended to join in a cooperative association with a common goal, it would be just as likely, if not more likely, that the persons pooled together would be competitors rather than persons working in concert to achieve a common objective." (internal citations omitted)).

for aiding and abetting a drug distribution conspiracy. *Id. at 1393–94.*

Conspiracy and aiding and abetting liability—though close cousins—are distinct legal concepts: in the drug context, conspiring to distribute drugs involves knowing of and intentionally joining the conspiracy, *see Direct Sales*, 319 U.S. at 712; aiding and abetting a drug distribution conspiracy involves knowingly helping the conspiracy succeed, *see Nye & Nissen v. United States*, 336 U.S. 613, 619–20 (1949) (citing *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.)). "[W]e do not subject [buyers and sellers] to additional liability as conspirators simply because they aided the conspiracy and derived a benefit from doing so." *Townsend*, 924 F.2d at 1393 (citing *Nye*, 336 U.S. at 620; *Pereira v. United States*, 347 U.S. 1, 11 (1954)). This is because we cannot infer intent to *join* the conspiracy based on aid to the conspiracy. *Id.* ("[W]e cannot infer that both parties agreed to work together to achieve that result from the fact that they engaged together in some other crime.") (citing *Falcone*, 311 U.S. 205)). For these reasons, though a buyer-seller relationship involving repeat, large-scale drug transactions may be enough to sustain a conviction for aiding and abetting a drug distribution conspiracy, it is not enough to establish intent to join the conspiracy and, therefore, cannot sustain a drug distribution conspiracy conviction.

Three, in addressing cases involving a single sale of a restricted good in a small quantity, the majority opinion again misquotes—and in doing so, misstates—the Supreme Court's reasoning in *Direct Sales*. The majority states: "Of course, a single sale of a restricted good in a low quantity does not, by itself, support a charge of conspiracy, even if the seller knows

that the good will be used for further illegal activity. [*Direct Sales*, 319 U.S.] at 712. But this does not mean that a seller can sell contraband 'in unlimited quantities.'" *Ante,* at 10.

While the majority's citation may seem at first blush to support its position, it decidedly does not. The *Direct Sales* Court indeed observed that a seller cannot sell restricted goods "in unlimited quantities." *Id.* at 712–13. But the majority opinion leaves out critical context: the Supreme Court did not make this "unlimited quantities" observation to suggest that any sale beyond a small, single transaction satisfies the elements of a drug distribution conspiracy charge. *Id.* Quite the opposite. The *Direct Sales* Court made that reference to underscore that, even where "unlimited quantities" of drugs are at issue, the analysis is not done. Rather, the defendant's intent—not his knowledge—remains central to the drug distribution conspiracy inquiry:

> *The difference in the commodities has a further bearing upon the existence and the proof of intent*. There may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken. Concededly, not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy. But this is not to say that a seller of harmful restricted goods has license to sell in unlimited quantities, to *stimulate* such sales by all the high-pressure methods, legal if not always appropriate, in the sale of free commodities .…

*Id.* (emphasis added).

Four, the majority further muddles the "quantity and fre-
quency" consideration by conflating two distinct factors:
number of sales (that is, frequency), and "prolonged cooper-
ation." The majority says:

> Of course, a single sale of a restricted good in a
> low quantity does not, by itself, support a
> charge of conspiracy, even if the seller knows
> that the good will be used for further illegal
> activity. *Id.* at 712. But this does not mean that a
> seller can sell contraband "in unlimited
> quantities." [*Id.*] Rather, as plain from the
> hypothetical above, when the evidence shows
> that a buyer and seller worked in "prolonged
> cooperation" for a plainly unlawful purpose—
> the seller supplying the buyer with stock for his
> illicit enterprise—"there is no legal obstacle to
> finding that the supplier not only knows and
> acquiesces, but joins both mind and hand with
> him to make its accomplishment possible." *Id.* at
> 713.

*Ante*, at 10 (citing *Direct Sales*, 319 U.S. at 712–13).

To the extent the majority believes that repeat transactions
*necessarily* imply "prolonged cooperation," I must disagree.
Repeat transactions may serve as evidence of the prolonged
cooperation, but the two factors remain distinct. The number
of sales is "significant only insofar as it cast[s] light on the ex-
istence of a continuing relation"—that is, "prolonged cooper-
ation"—which could imply an agreement beyond a simple
purchase and sale. *Lechuga*, 994 F.2d at 349–50. *Direct Sales*
says so:

> What made "prolonged cooperation" a factor in
> inferring conspiracy in *Direct Sales Co. v. United
> States*, 319 U.S. 703, 713 (1943), was that it
> showed that the defendant not only knew that
> it was selling drugs to someone for use in an il-
> licit enterprise but had "join [ed] both mind and
> hand with him to make its accomplishment pos-
> sible." *See also id*. at 712 n. 8. Prolonged cooper-
> ation is neither the meaning of conspiracy nor
> an essential element, but it is one type of evi-
> dence of an agreement that goes beyond what is
> implicit in any consensual undertaking, such as
> a spot sale.

*Lechuga*, 994 F.2d at 350; *see also United States v. Brack*, 188 F.3d
748, 761 (7th Cir. 1999) (citing *Lechuga*, 994 F.2d at 349–50;
*United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (per
curiam)); *see also United States v. Mims*, 92 F.3d 461, 463 (7th
Cir.), *on reh'g*, 101 F.3d 494 (7th Cir. 1996).

***

Third, the majority's reading of *Direct Sales* misquotes the
Supreme Court regarding the "informed and interested coop-
eration, stimulation, instigation" necessary to establish intent.
*See* 319 U.S. at 713. The majority opinion misconstrues the cen-
tral holding in *Direct Sales* not once, *ante*, at 11 ("For these rea-
sons, the Supreme Court had no trouble affirming Direct
Sales's conspiracy conviction based solely on evidence of re-
peated, distribution-quantity sales of morphine."); not twice,
*ante*, at 11 ("All told, *Direct Sales* provides three principles for
determining which types of buyer-seller relationships are in-
dicative of a conspiracy.… [and the] [t]hird, [is] a drug con-
spiracy conviction can be sustained if the government proves

that a buyer and seller engaged in repeated, distribution-quantity drug transactions."); but three times, *ante*, at 7 ("Based on these repeated, distribution-quantity transactions, Direct Sales was convicted of conspiracy to distribute narcotics."). No portion of the majority opinion accurately acknowledges, much less grapples with, the Supreme Court's careful consideration of the "informed and interested cooperation, stimulation, instigation" necessary to prove intent. The only sentence in the majority opinion that cites this language once again misquotes *Direct Sales*. The majority would have the reader believe that repeat, distribution-quantity transactions involving illicit goods bridge the gap between knowledge and intent—that these types of transactions by themselves show "informed and interested cooperation, stimulation, [and] instigation." *See ante*, at 9. But, as I explained above, *Direct Sales* says the opposite: Alone, such transactions do not establish the stimulation or active incitement necessary to transform knowledge into intent. *See ante*, at 38–42, 53–62.

**ii.**

I turn now to the majority's *Colon* analysis. This analysis suffers from two flaws.

First, the majority opinion claims that *Colon* is the "origin[]" of "a long line of cases that have stretched the buyer-seller doctrine too far and deviated from the standard set in *Direct Sales*." *Ante*, at 11. According to the majority, *Colon* introduced a requirement for "additional evidence," like sales on credit or warnings about future threats, to support conspiracy convictions. *See ante*, at 12. But the majority's attempt to pin these factors on *Colon* doesn't hold up. As shown above, the additional evidence discussed in *Colon* wasn't an invention of the *Colon* panel; it was a straightforward

application of the rule set forth in *Direct Sales*—a rule our circuit has faithfully adhered to ever since, at least until today. *See ante*, at 49–50.

Second, in discussing *Colon*, the majority states that "[r]epeated, distribution-quantity transactions of illegal drugs do not reflect a mere buyer-seller relationship between the parties." *Ante*, at 12. Again, this assertion directly contradicts *Direct Sales*. As discussed, *Direct Sales* establishes that quantity and frequency at best create certainty as to knowledge, leaving intent outstanding. 319 U.S. at 714–15. And where there is no intent, there is no conspiracy—instead, a mere buyer-seller relationship exists. *Id.* at 712.

### 3

### The Majority Opinion's Other Omissions

The majority opinion reaches its conclusion but says nothing about three critical considerations and consequences: the absence of any compelling reason for overturning *Colon* and its progeny; the silent undoing of *Lechuga*, our decades-old en banc decision on the same issue; and the serious due process concerns today's ruling introduces.

### i.

We've long held that panel decisions should be overturned by the en banc court only when compelling reasons demand it. *See United States v. Carpenter*, 104 F.4th 655, 658 (7th Cir. 2024); *see also Arizona v. Rumsey*, 467 U.S. 203, 212 (1984) (explaining that the doctrine of stare decisis "carries such persuasive force" that departing from it has "always required" "special justification"). What reason does the majority give? None.

*Colon* and its progeny correctly interpret and apply *Direct Sales*. *Ante*, 49–50. To the extent that the majority thinks otherwise, I note our rule that "[m]ere disagreement with the law or a desire to see the law change is not enough." *Carpenter*, 104 F.4th at 658 (citing *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005) ("[I]f the fact that a court considers one of its previous decisions to be incorrect is a sufficient ground for overruling it, then stare decisis is out the window, because no doctrine of deference to precedent is needed to induce a court to follow the precedents that it agrees with.")).

No intervening Supreme Court decision compels us to reconsider our settled view.

Nor is there a circuit split of the kind that would justify breaking with our prior rulings. Rather, today's decision shifts us from one side of an inter-circuit divide to the other. *See United States v. Lamon*, 893 F.3d 369, 371 (7th Cir. 2018) (explaining that "the mere existence of a circuit split does not justify overturning precedent"); *Buchmeier v. United States*, 581 F.3d 561, 566 (7th Cir. 2009) (counseling against "one circuit's restless movement from one side of a conflict to another").

No intra-circuit conflict exists either. *See Buchmeier*, 581 F.3d at 566. We've done nothing new in this circuit since *Direct Sales*. Since then, we have held clearly and consistently that quantity and frequency of drug transactions alone are insufficient to sustain a drug distribution conspiracy conviction.

We said "no"—repeat, distribution-quantity drug sales are not enough—in *Townsend*, a 1991 case decided almost two decades before *Colon*. It's hard to tell "just what agreement can reasonably be inferred from the purchase, even the repeated purchase, of contraband," we explained. *Townsend*,

924 F.2d at 1392 (quoting *United States v. Borelli*, 336 F.2d 376, 383 (2d Cir.) (Friendly, J.), *cert. denied*, 379 U.S. 960 (1964)). And "[t]he mere purchase or sale of drugs (even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy .…" *Id.* at 1394.

We said "no"—repeat, distribution-quantity drug sales are not enough—in *Contreras*, a 2001 case decided well before *Colon*. There, we held that "[t]he multiple purchases [of 'one-kilogram quantities'] by themselves," "without any additional evidence of the kind we have mentioned"—such as "fronting" or "favorable pric[ing] on the cocaine on the expectation of future purchase"—"do not permit the inference that the [] supplier conspired with [the buyer]." *Contreras*, 249 F.3d at 599.

We again said "no"—repeat, distribution-quantity drug sales are not enough—in *Rivera*, another pre-*Colon* case from 2001. There, we held that the buyer's repeated large quantity purchases and seller's "knowledge of the buyer's illegal activities or resale objectives," did not transform a "mere buyer-seller arrangement" into a conspiracy. 273 F.3d at 755–56 (internal citations omitted). We concluded that the evidence "show[ed] none of the plus factors necessary to infer … a conspiracy." *Id.* at 755–56.

We said "no" once again—repeat, distribution-quantity drug sales are not enough—in *Thomas*, a pre-*Colon* case from 2002. There, we concluded, "[p]roof that Thomas sold a distribution quantity of crack cocaine to Jones on one or more occasions does not by itself establish that Thomas conspired with Jones and her associates." 284 F.3d at 751. "That Thomas was *aware* of the conspiracy to distribute narcotics does not establish his membership in the conspiracy" as "*[k]nowing* of

a conspiracy differs from *joining* a conspiracy." *Id.* at 752 (first emphasis added) (quoting *Torres-Ramirez*, 213 F.3d at 982). "One who deals in larger quantities of narcotics will invariably realize that his buyer intends to resell," we said, "and that in all likelihood he will have help from others in doing so. That knowledge alone does not render the seller liable as a co-conspirator." *Id.* (citing *Torres-Ramirez*, 213 F.3d at 982).

And we said "no" once again in *Askew*—yet another pre-*Colon* case decided in 2005. "[I]n the case of a drug conspiracy, evidence of repeated sales alone is not enough to support a conviction. Rather … in conspiracy cases the jury must assess a host of factors—including repeated sales—to determine whether an agreement beyond the simple purchase of drugs exists." *Askew*, 403 F.3d at 503 (citing *Mims*, 92 F.3d at 466); *see also Mims*, 92 F.3d at 463 (explaining that, "while purchase of narcotics for resale is *evidence* of a conspiratorial agreement (especially when the purchases are repeated as they were here), a buyer-seller relationship alone is insufficient to prove a conspiracy").

Most critically, we said "no" in *Lechuga*—our en banc decision from 1991 addressing the very issue the full court decides today. The lead opinion concluded that "large quantities of controlled substances, without more, cannot sustain a conspiracy conviction." *Lechuga*, 994 F.2d at 347. "What is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Id.*; *see also United States v. Baker*, 1 F.3d 596, 597 (7th Cir.), *cert. denied*, 510 U.S. 956 (1993) ("[T]here must be facts in evidence in addition to a sale for resale from which proof of a conspiracy to distribute can be inferred."). *Lechuga* treated frequency no different: "the number of sales" was "significant only insofar as it cast

light on the existence of a continuing relation, implying an agreement with an objective beyond a simple purchase and sale—the latter being an agreement, all right, but not a conspiracy." *Id.* at 349–50.

The fact that we decided *Lechuga* en banc cannot be swept aside. The case demands our attention—far more than the silence the majority affords it. In my review of our circuit law, I found no instance where our en banc court overturned a prior en banc decision absent an intervening change in the law by the Supreme Court. *See, e.g.*, *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 852 (7th Cir. 2012) (en banc) (overturning a prior en banc decision based on the "recent string of decisions" issued by the Supreme Court "undermin[ing] the holding" in the prior en banc decision). That makes sense. If we require a compelling reason to overturn a three-judge panel decision, how much more when considering whether to overturn an en banc decision—a ruling that is supposed to represent the collective wisdom of the full court?[12]

But today, for the first time in our court's history, the majority says "yes": quantity and frequency alone can sustain a drug distribution conspiracy conviction. In saying "yes," the

---

[12] We consider several other factors in deciding whether to overturn precedent, including (1) whether the rule is supported by a single, isolated case or a series of cases (as this dissent has noted, the rule that repeat, distribution-quantity drug transactions cannot sustain a drug conspiracy was approved and followed in more than three dozen panel decisions and one en banc decision), *see Tate*, 431 F.3d at 583; and (2) whether reliance interests have built up around the decision (here, the reliance interests at stake are obvious, where a rule that repeat, distribution-quantity drug transactions cannot sustain a drug conspiracy conviction has stood unchallenged in this circuit for over 80 years), *see id*. at 583; *see, e.g.*, *United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 486 (1924).

majority opinion does not cite—nor have I found—a single decision by a panel of this circuit holding that repeat, distribution-quantity drug transactions alone can sustain a drug distribution conspiracy conviction. That is not surprising. The rule the majority announces today has never been the law of this circuit.

What we are gaining from this jurisprudential disruption is unclear, but what we risk losing—respect as a court committed to making decisions grounded in the rule of law no matter the case—is all too evident.[13]

## ii.

The majority's decision to effectively eliminate the intent requirement from our drug distribution conspiracy law raises serious due process concerns.

The Due Process Clause of the Fifth Amendment guarantees that no person shall be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. Due

---

[13] The consequences of today's decision will be felt beyond sufficiency of the evidence challenges. Take plea bargains for example. We have based our drug conspiracy plea bargaining jurisprudence on the bedrock principle that repeat, distribution-quantity transactions, by themselves, are insufficient to support a conspiracy conviction. *United States v. Goliday*, 41 F.4th 778, 783 (7th Cir. 2022) ("Time and again we have underscored that proof of an ordinary buyer-seller relationship alone is insufficient to support a conviction under § 846." (citing *United States v. Neal*, 907 F.3d 511, 515 (7th Cir. 2018); *United States v. Long*, 748 F.3d 322, 325 (7th Cir. 2014))); *Long*, 748 F.3d at 326 ("The government may … not rely solely on purchases and sales, which after all are present in both buyer-seller and conspiracy arrangements.… Standing alone, []large-quantity sales … can[not] sufficiently distinguish a conspiracy from an ordinary buyer-seller relationship."). What now?

process requires that the government prove each element of a crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). Criminal conspiracy, in particular, has always required that the government prove the defendant knowingly *and* intentionally entered into an agreement to commit a crime. *See Direct Sales*, 319 U.S. at 712. By effectively excising the intent requirement from the drug distribution conspiracy law of our circuit, my colleagues relieve the government of its burden to prove all elements of a conspiracy, striking at the heart of due process.[14]

The Due Process Clause also protects against vague laws that fail to provide adequate notice of prohibited conduct or encourage arbitrary enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Without the requirement of intent, the line between a buyer-seller relationship and a conspiracy is blurred, expanding prosecutorial discretion and inviting arbitrary enforcement.

Plainly, our rules for overturning precedent and our duty to uphold the Constitution both counsel against the majority's decision.

---

[14] To illustrate the due process stakes involved in eliminating the intent requirement, consider the line between conspiracy and aiding and abetting liability—theories that we keep distinct for good reason. "True, aiding and abetting presupposes the existence of more than one actor, but aiders and abettors are *already punished as principals*." *Townsend*, 924 F.2d at 1393 (emphasis added); *see also Nye*, 336 U.S. at 620. "To justify imposing *additional* criminal liability, there must be some *additional* evidence that their actions are intended to bring about the object of the conspiracy." *Id.* (citing *Iannelli*, 420 U.S. at 777–78). Notably in this case, the conspiracy charge carried a mandatory minimum five years' imprisonment that an aiding and abetting charge would not have.

## C

### Under Our Old Law, a Buyer-Seller Instruction

### Is Appropriate

Now, I turn to the facts of this case, applying the correct legal framework as it existed before today's decision. Under that framework, Page is entitled to a buyer-seller instruction. The majority's claim otherwise falls flat.

As evidence that Page joined a conspiracy with drug supplier Terrance Hamlin, the majority first points to the personal relationship between the men. *See ante*, at 3. The majority considers that relationship, described at trial as akin to that of an uncle (Hamlin) and nephew (Page), as evidence of mutual trust. Yet, trust between a buyer and seller, even if rooted in a longstanding personal relationship, does not necessarily transform routine drug transactions into a conspiracy. When that trust arises from a familial connection, as it did here, it is also likely that any warnings exchanged between the two men were the product of genuine solicitude as opposed to a shared criminal enterprise. *Cf. United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989) (explaining that "[c]ourts must be especially watchful to uphold this principle"—that "[t]he government must prove that the defendant took some step beyond 'mere association with, knowledge of, approval of, or presence at a conspiracy'"—"when a conspiracy is alleged to be composed of family members").

Second, the majority claims that Hamlin's advice to Page about avoiding certain individuals—coupled with Hamlin's description of a "cooperative" business relationship with Page—suggests a conspiracy. *See ante*, at 16. This is a leap. For one, it wasn't "individuals" (plural) that Hamlin advised

Page to be circumspect around, but a single person: Page's cousin. Furthermore, a jury could find that a seller who provides guidance to ensure the buyer's continued satisfaction is acting in self-interest to protect future sales, not necessarily to advance a joint conspiracy. Even where the facts suggest that "[the seller] made some effort to please and keep [the buyer] as a customer," or reflects "an ongoing effort to cultivate [the buyer] as a customer," "what they do not reflect is a shared stake in the success of [the buyer's] distribution enterprise." *Thomas*, 284 F.3d at 754. The seller may have done "what any good haberdasher might do—[the seller] got to know his customer's needs and aimed to meet them." *Id.* (citing *Rivera*, 273 F.3d at 756 ("The government showed only that [the defendant] wanted [his customer's] business—that is indicative of a buyer-seller relationship, not a conspiracy.")).

Third, the majority highlights as evidence of a conspiracy Hamlin's decision to give Page a lower price per gram because Page could move drugs quickly. *See ante*, at 16. But offering a discount to a high-volume customer is a standard business practice in both legitimate and illicit marketplaces. *See Pulgar*, 789 F.3d at 813 (holding evidence was insufficient to sustain conspiracy conviction, even though "Pulgar, no doubt, sold large quantities of cocaine to Schmidt at wholesale prices for a period of eleven years"); *Vizcarra-Millan*, 15 F.4th at 510–11 ("We do not need to determine whether the $100 is better described as a front or a discount. Either way it was extremely weak evidence of conspiracy.").

Fourth, the majority states that Page and Hamlin "consistently notified each other about the status of their drug supply and their clientele." *Ante*, at 16. But the majority does not support this claim with facts from the record, nor does it explain

how "consistently notifying" each other on the "status" of drug supply—whatever these terms may mean—helps us distinguish between a buyer-seller and a conspirator.

Fifth, the majority emphasizes a conversation between Page and Hamlin about expanding their separate businesses "up north" as evidence of a conspiracy. *See ante*, at 16. But this discussion didn't lead to anything, perhaps because Page was pursuing his own, separate venture with buyers in that region. In short, a buyer's rejection of a seller's proposal to merge their businesses may not be evidence of an agreement to further distribute, but evidence militating against such an agreement.

Lastly, the majority points to a single instance in which Hamlin allowed Page to return a tainted bag of heroin, calling this a "sale on credit" and evidence that Page and Hamlin shared an interest in delivering high-quality heroin to Page's customers. *See ante*, at 4, 16. The facts tell a different story. A sale on credit in the context of drug transactions involves supplying drugs without immediate payment, with the expectation of future payment after resale. *Askew*, 403 F.3d at 502, 504. That didn't happen here. Page had already paid for the heroin and was merely exchanging a defective product. This was no more a "sale on credit" than a consumer returning an item for a refund that must be used at the same store. The store already has the buyer's money; it is willing to take back the product, but instead of supplying a refund in cash, it gives the buyer the chance to purchase something else.

Crucially, this kind of transaction doesn't necessarily indicate mutual trust or a shared interest in each other's success the way that sales on credit might. There is no trust on the part of the seller who holds the buyer's money in hand and

there is only negligible trust on the part of the buyer who, unless the seller goes out of business, will hold the product in hand too. No mutual trust is necessary—everyone comes out even. Indeed here, neither party needed to trust the other at all: Page cashed in his refund immediately, exchanging the bad batch of heroin for a better batch. So Hamlin never risked lost profits, and Page did not risk Hamlin shutting down shop. That is unlike a seller who allows a customer to obtain drugs on the promise of payment at a later date. *See Torres-Ramirez*, 213 F.3d at 982 ("Payment *before* delivery differs from delivery before payment, the 'fronting' transaction from which an inference of agreement may be drawn." (emphasis added) (internal citations omitted)).

Ultimately, the evidence the majority relies on falls short of what we have required to rule out a buyer-seller instruction. Until today.

## II

### Page's Buyer-Seller Instruction Challenge

I now turn to the issue of the missing buyer-seller instruction. Page contends that the district court should have instructed the jury on the difference between a drug distribution conspiracy and a conventional buyer-seller relationship. Page did not, however, object to this omission at trial. That leaves us to review the issue for plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993). We reverse a conviction under the plain error standard when (1) an error occurred; (2) it was plain; (3) it affected the defendant's substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See id.* at 732. The

majority concludes that no plain error occurred. I disagree. In the sections that follow, I address each part of the plain error test.

## A

## There Was Error

First, there was error. A defendant is entitled to an instruction if: (1) "the instruction represents an accurate statement of the law;" (2) "the instruction reflects a theory that is supported by the evidence;" (3) "the instruction reflects a theory which is not already part of the charge;" and (4) "the failure to include the instruction would deny the defendant a fair trial." *United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014) (cleaned); *see also United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir. 1987). The first and third criteria are not in dispute. Page's proposed instruction is faithful to the law and was not already part of the charge. The remaining criteria—the second and fourth—are whether the evidence at trial supported such an instruction and whether its absence compromised the fairness of the trial.

The second question asks whether the proposed buyer-seller instruction reflects a buyer-seller theory that is supported by the evidence or, as *Grimes* also puts it, has "some foundation in the evidence, however tenuous." *United States v. Grimes*, 413 F.2d 1376, 1378 (7th Cir. 1969) (citing *United States v. Phillips*, 217 F.2d 435, 442–43 (7th Cir. 1954)); *see also United States v. Buchmeier*, 255 F.3d 415, 427 (7th Cir. 2001) (holding that "[a] defendant's theory of defense need only have 'some foundation in the evidence, however tenuous,'" to require an instruction). "[W]here there is proof," "[i]t is not the province … of the trial court[] to appraise the

reasonableness or unreasonableness of the evidence." *Phillips*, 217 F.2d at 442. "That is unnecessary, for in criminal cases the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *Id.* at 443.

Having examined the trial transcripts, I agree with Page that the theory that his involvement with Hamlin constituted a mere buyer-seller relationship, rather than that of co-conspirators in a drug distribution conspiracy, has "some foundation in the evidence." As discussed above in addressing Page's sufficiency of the evidence challenge, when we accurately assess what the government and the majority insist are indicia of conspiracy, we see that not much at trial suggested a conspiracy beyond evidence showing Page repeatedly purchased distribution-sized quantities of heroin. And, again, that's not enough.

As for the fourth question—whether the failure to include the instruction would deny the defendant a fair trial—we have answered "yes" where the evidence of the conspiracy was "far from overwhelming" and "the evidence could have been interpreted by the jury as indicating that the defendants were merely purchasers from the conspiracy." *Douglas*, 818 F.2d at 1322.

For these reasons, the district court's failure to give a buyer-seller instruction was error. The majority's contrary conclusion rests on a faulty foundation. I make three observations about this below, the first being the longest. *See post*, at 50–60 (discussing Page's theories of defense), 60–61 (reprising discussion of repeat, distribution-quantity transactions), 61–62 (discussing sua sponte instructions).

One, the majority contends that Page was not entitled to a buyer-seller instruction because it would have contravened Page's theory of defense. This is because, the majority says, Page painted Hamlin as a liar and suggested that his meetings with Hamlin were innocent encounters between family friends. Page's goal, the majority thinks, was to show that he was not involved in the drug trade at all, so that the jury would acquit him of both the drug distribution charges and the conspiracy charge—not just the latter. And because "we have repeatedly held that a buyer-seller instruction is unnecessary where the instruction would contradict the defendant's theory of the case," *ante*, at 19 (quoting *United States v. Love*, 706 F.3d 832, 839 (7th Cir. 2013)), the majority opinion explains, Page's claim of error fails.

The majority opinion misreads the facts and the law in two ways. One, Page did advance the theory that he engaged in a buyer-seller relationship; so, a buyer-seller instruction would not have conflicted with Page's defense theory. Two, while our consideration of whether a defendant put forth a buyer-seller theory is relevant, it is not dispositive. Our inquiry into whether a buyer-seller theory has some foundation in the evidence extends beyond the defendant's arguments to a holistic review of the record. I take each of these in turn.

Page did assert at trial that he engaged in a buyer-seller relationship. Recall that Page did not testify, so his defense

theories would come through his counsel's opening state-
ment, cross-examinations, and closing argument.[15]

---

[15] The majority states that "a party does not properly inject a defense
into a criminal proceeding solely by introducing it during closing argu-
ment." *Ante*, at 21. This analysis falters for three reasons.

One, it is irrelevant. Page did not raise the buyer-seller theory for the
first time in closing argument; he introduced and developed the theory
during cross-examination. *See, e.g.*, Trial Tr. at 734:5–14.

Two, even if Page had introduced the buyer-seller theory for the first
time during closing argument, the Supreme Court has made it clear that
closing argument is counsel's opportunity to synthesize the evidence and
articulate the defense theory. *See Herring v. New York,* 422 U.S. 853, 861–62
(1975). "It is only after all the evidence is in that counsel for the parties are
in a position to present their respective versions of the case as a whole.
Only then can they argue the inferences to be drawn from all the testimony
…." *Id*. at 862 (describing "the opportunity finally to marshal the evidence
for each side before submission of the case to judgment"). Far from being
a procedural afterthought, closing argument is the moment when counsel
"make[s] a proper argument on the evidence and the applicable law in his
favor, however simple, clear, unimpeached, and conclusive the evidence
may seem." *Id*. at 860. Surely, the majority can appreciate the importance
of closing argument, given its emphasis on the fact that, "through cross
examination and closing argument, Page's counsel spent considerable
time painting Hamlin as a liar." *Ante,* at 5.

Three, the majority's invocation of Rule 30 fares no better. The major-
ity asserts that defendants cannot raise a theory for the first time during
closing argument because, "[u]nder Rule 30, a party seeking an instruction
'must' make its request 'at the close of evidence or at any earlier time,' and
the court 'must inform the parties before closing arguments how it intends
to rule on the requested instructions.'" *Ante*, at 21 (citing Fed. R. Crim. P.
30(a)–(b)). But the reliance on Rules 30(a) and (b) is misplaced. These rules

During closing, defense counsel argued that Page purchased controlled substances for personal use, although the evidence was contradictory, arguing "a [distribution] amount is whatever … the government … wants a [distribution] amount to be"—whether it be a quarter gram, a half gram, one gram, two grams, three grams, or more. Trial Tr. at 815:4–17. And if "some heroin user" has two baggies in his pocket, defense counsel argued, the government will say even that is a distribution amount. Trial Tr. at 815:17–19. And if the heroin user says it is not ("that is my personal use amount") the government will say "there was a lot found." Trial Tr. at 815:17–22.

Defense counsel did not stop there, stating:

---

apply to "requested instructions" made pursuant to Rule 30(a) and neither party requested a buyer-seller instruction here.

Rule 30(d), however, governs objections to jury instructions, including objections to a court's failure to give an instruction. Rule 30(d) expressly permits objections to be raised before the jury retires to deliberate: "A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). This rule makes clear that omissions can—and should—be addressed even late in the trial process.

Rule 30(c) reinforces this point. As the Advisory Committee notes explain, Rule 30(c) allows the court to "instruct both before and after arguments, which assures that the court retains power to remedy omissions in pre-argument instructions or to *add instructions necessitated by the arguments*." Fed. R. Crim. P. 30, advisory committee notes to 1987 amendments (emphasis added). This flexibility exists precisely to address situations like this one, where an omitted instruction becomes necessary in light of the evidence and closing arguments.

And I would counter that with there [are] indi-
viduals, and maybe somebody in our families,
who like[] to go to Costco or Sam's Club. And
why is that? Because you can buy a large bulk
material allegedly at a lower price.… [Y]ou go
and buy in larger bulk, one, because it means
you're not going back and forth. You have what
you want. And you can use it over time for what
you want.

And do you know what else it provides for per-
sonal use people? Safety. Because every time
you have to go out and purchase a drug from
somebody, you're putting yourself at risk. No
matter the level of trust that you may have,
you're putting yourself at risk. And some ad-
dicts and personal use people don't want to put
themselves in that kind of risk where they have
to go out every day or every other day or once a
week, because that is the big risk you're taking.

Trial Tr. at 815:23–816:13. A jury can interpret these argu-
ments only one way: Page purchased controlled substances in
bulk for personal use—not to distribute. It is clear that Page
did assert a buyer-seller defense theory, making the buyer-
seller instruction fully consistent with his defense—not at
odds with it, as the majority concludes.[16]

---

[16] The majority contends that appellate counsel conceded at oral argu-
ment that trial counsel did not present a buyer-seller theory. I disagree.
*See* Oral Argument at 22:15. And even if reasonable jurists could read
counsel's various remarks differently, any seeming concession was far
from deliberate, clear, and unambiguous. *See Robinson v. McNeil Consumer*

Perhaps the majority's real concern is not that the buyer-seller instruction would have contradicted Page's defense theory, but rather that Page presented *two* defense theories that seem, at first glance, to be at odds. On one hand, Page claimed innocence, arguing that he *did not* buy or sell drugs and was thus not guilty of drug distribution. On the other, he claimed to be a mere buyer-seller, arguing that if he *did* buy drugs, it was solely for personal use or to sustain his own separate operation, not as part of a larger conspiracy and he therefore was not guilty of drug distribution conspiracy. I have two responses. First, these two theories are not inconsistent. Second, even if they were inconsistent, that would not nullify the need for a buyer-seller instruction.

Here's why Page's two defense theories were not inconsistent. By charging both drug distribution and drug distribution conspiracy, the government itself invited the jury to consider multiple possibilities. The government's case-in-chief, through its witnesses and arguments, suggested that Page distributed drugs. Those same witnesses and arguments also suggested that Page conspired to do the same. When a defendant, as here, declines to testify and otherwise remains silent regarding the charges, he neither admits nor denies any specific crime. At the close of such a case, the jury must assess guilt or innocence on *each* charge after considering the distinct defenses applicable to each. In this context, trial counsel can argue that (1) the government failed to prove beyond a reasonable doubt that Page committed drug distribution; and (2)

*Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) (explaining that, "in order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous").

even if the government proved Page bought drugs that Hamlin sold, the government did not prove beyond a reasonable doubt that Page joined a conspiracy to further distribute the drugs he purchased from Hamlin. It then would fall to the jury to determine whether Page bought drugs that Hamlin sold and, if so, whether Page's actions amount to mere drug purchases within a buyer-seller relationship or the intentional joining of a broader conspiratorial agreement. So, Page's two defense theories are not inconsistent; they are merely garden-variety alternative contentions and framing these alternative defenses is one way a defendant can respond to the government's multi-faceted charges.

Here's why, even if Page's two defense theories were inconsistent, that inconsistency would not preclude a buyer-seller instruction. The law does not require a defendant to concede guilt on a drug distribution charge to receive a buyer-seller instruction on a related drug distribution conspiracy charge. Criminal defendants are entitled to assert inconsistent defenses at trial. *See Mathews v. United States*, 485 U.S. 58, 65–66 (1988) (permitting the inconsistent defenses of denial and entrapment). This principle reflects a core tenet of modern criminal jurisprudence: a defendant is entitled to the full measure of constitutional protections when mounting a defense against prosecution. It underscores a commitment to limiting governmental overreach in criminal trials, ensuring that the burden of proof remains firmly on the government as to all charges. *Winship*, 397 U.S. 358 (1970) (holding that the Due Process Clause requires the government to prove every element of every crime beyond a reasonable doubt); *Taylor v. Kentucky*, 436 U.S. 478 (1978) (emphasizing the presumption of innocence as a bedrock principle of American criminal law,

and requiring explicit instructions to the jury to prevent implicit shifting of the burden of proof).

Even when two defenses appear inconsistent as to each other, an instruction on both theories is required if, as here, the law supports both theories and some foundation in the evidence provides a basis for their application—even if that evidence is "weak, insufficient, inconsistent, or of doubtful credibility." *Phillips*, 217 F.2d at 443.[17] This principle is especially important in drug cases, as the government often charges defendants with drug distribution *and* drug distribution conspiracy. In these cases, the government's own evidence blurs the line between distribution and conspiracy, often presenting the same facts as equally suggestive of both. Yet, under the majority's rule, any defendant who dares to defend himself against the drug distribution charge by claiming innocence when he is also charged with drug distribution conspiracy, must—as a matter of law—forfeit the opportunity to instruct the jury on his alternative buyer-seller defense.

---

[17] *See also Eberhart*, 467 F.3d at 666 ("A jury instruction [] does not have to completely track the defense presented; it need only represent 'a theory that is supported by the evidence.'" (quoting *Buchmeier*, 255 F.3d at 426)); *Douglas*, 818 F.2d at 1318, 1321 (concluding that the defendant's buyer-seller theory was supported by the record despite "confusing and contradictory" evidence about the relationship between the co-conspirators and defendants, and about whether the drug amounts were distribution quantities or personal use quantities); *United States v. Cruse*, 805 F.3d 795, 815 (7th Cir. 2015) (explaining that "the government's understanding of [*Love*, *Johnson*, *Askew*, and *Fort*]" as holding that defendants who deny buying and selling drugs are barred from receiving a buyer-seller instruction as a categorical matter "is in tension with *Mathews v. United States*, 485 U.S. 58, 63–64 (1988), which holds that inconsistent defense theories are permissible").

This imposes an untenable burden on defendants and risks significant constitutional harm.

To be sure, a defendant who denies distributing drugs while simultaneously asserting a buyer-seller defense takes on significant strategic risks. But strategic calculations are for the defendant and jury to navigate; our responsibility is to ensure the jury is properly instructed on the law.

And still, our analysis of whether the buyer-seller theory has some foundation in the evidence does not end there. We have explained that whether a defendant brings forth a buyer-seller theory is only *one* consideration. We *also* conduct a holistic review of the evidence, including the facts and arguments presented by the government, to make this determination. *See Phillips*, 217 F.2d at 440–41 (rejecting as clearly erroneous the argument that the government's evidence can never entitle the defendant to a jury instruction).[18]

---

[18] In *Phillips*, this court considered whether a defendant could rely "upon favorable testimony given by government's witnesses" in presenting this defense or if "there must be testimony coming from his side of the case" "as a prerequisite to his right to such an instruction." On this, we said:

> We think this was clearly an erroneous idea, the effect of which was to shift the burden of proof.…

> We think the government's contention, apparently embraced by the trial court, that a defendant is not entitled to an instruction embodying a theory merely because it is predicated upon proof adduced by the government, is not the law.…

Here, the government layered protracted testimony dis-
tinguishing personal use quantities from distribution quanti-
ties upon weak conspiratorial evidence, thereby carving out
space for the jury to confuse conspiracy with a buyer-seller
relationship. The government opened its case by telling the
jury that Page purchased "distribution quantities" of heroin,
ranging from over twelve grams up to fifty-six grams at a
time, juxtaposing this amount against "user quantit[ies]" of
heroin, ranging from 0.1 grams for beginners up to 0.5 grams
for heavy users. Trial Tr. at 153:13–24. One government wit-
ness testified that forty-five grams (one of the amounts Page
received from Hamlin) is "a larger quantity" of heroin: "It

> [T]he vital question from the time a plea of not guilty is
> entered until the return of the verdict, is whether upon all
> the evidence, by whatever side adduced, guilt is estab-
> lished beyond reasonable doubt.…
>
> [The government] then cites *United States v. Phelps*, 8 Cir.,
> 160 F.2d 858, 874, and *Meyer v. United States*, 7 Cir., 258 F.
> 212, 216, for the proposition that a court will not instruct
> on 'a defense not made by the defendant.' These cases fur-
> nish no support for the contention. They hold nothing
> more than that the court will not instruct upon a theory
> unsupported by evidence. Certainly they do not indicate,
> even by inference, that the evidence must come from the
> defendant's side of the case.

217 F.2d at 440–41 (citations omitted); *see also Askew*, 403 F.3d at 504 ("[W]e
must still review the evidence presented by the government to determine
whether it was such that a jury could confuse a buyer-seller relationship
with a conspiratorial one."); *Douglas*, 818 F.2d at 1321 (explaining that,
when determining whether a defendant's theory of defense is supported
by the evidence, the court "must [] analyze[] [the conspiracy case] accord-
ing to its specific facts" *and* "consider whether the defendant has put forth
the defense during trial").

would not be for personal use. I believe 45 grams of heroin would be an amount that someone would purchase to sell to other people." Trial Tr. at 408:7–12. And a different government witness took care to explain that a distribution quantity of heroin is sold in larger chunks held in sandwich, quart, or gallon-sized bags, while user quantities are sold in small bag corners called bindles. Trial Tr. at 724:23–726:6.

The government also pushed back against the suggestion that Page purchased controlled substances for personal use. The government elicited testimony about things personal users commonly possess (e.g., straws, spoons, bindles, needles and other things "like that indicating ingestion") in contrast to items distributors commonly possess (e.g., larger packaging materials, smaller packaging materials, scales, grinders, blenders, and adulterants). Trial Tr. at 726:7–22. Another government witness answered "no" again and again when asked during direct examination if he saw any needles, syringes, straws, rolled-up dollar bills, or burned aluminum foil in Page's home. Trial Tr. at 349:16–350:1. He also found significant that Page never showed signs of being sick or told authorities he was going to be sick when taken into custody because, in "[the witness's] experience in dealing with both heroin users and heroin distributors, … heroin users will … at some time say [] they're going to be sick because they're going to start withdrawing .…" Trial Tr. at 350:2–14.

In short, the government repeatedly emphasized the volume of drugs Page purchased from Hamlin and indicators that Page did not personally use drugs. The government did this to counter trial counsel's argument that, to the extent Page was buying drugs from Hamlin, it was merely as a buyer rather than a partner in a distribution conspiracy.

For these reasons, I conclude that the buyer-seller theory did have some foundation in the evidence.

Two, the majority contends that Page was not entitled to a buyer-seller instruction because, under our new law as established by today's decision, evidence of repeat, distribution-quantity transactions is sufficient to sustain a conspiracy conviction. *Ante*, at 14–15. This conclusion cannot stand for the reasons I outlined earlier in this dissent. *See ante*, at 51.

Further, we have repeatedly held the opposite: "Our finding [] that [a] jury had sufficient evidence to convict [a defendant] on the conspiracy count does not automatically negate his claim that the judge committed plain error in failing to provide the jury with a buyer-seller instruction." *Askew*, 403 F.3d at 503; *see also United States v. Gee*, 226 F.3d 885, 894–96 (7th Cir. 2000) (finding that the jury had sufficient evidence to convict on the conspiracy charge, but reversing for failure to give a buyer-seller instruction); *Mims*, 92 F.3d at 466 (finding ample evidence to support the conspiracy conviction, but reversing because the judge gave a flawed buyer-seller instruction). "'[B]ecause the line between a conspiracy and a mere buyer-seller relationship is difficult to discern, district judges should instruct juries in appropriate situations on the distinction' and 'inform juries that repeated transactions do not constitute a conspiracy.'" *Askew*, 403 F.3d at 503 (quoting *Gee*, 226 F.3d at 895); *id.* (citing *Thomas*, 150 F.3d at 745 ("[T]he jury should be told that *agreement*—the crime of conspiracy—cannot be equated with repeated transactions. This is the office of the buyer-seller instruction. It reminds juries that distribution of drugs is not itself conspiracy, although a history of transactions may be evidence of conspiracy.")).

Three, the majority posits that a district court can never err "by not sua sponte instructing the jury on a potential defense, particularly when the defendant is represented by counsel," framing the question as an "odd procedural" one. *Ante*, at 19. But this cannot be: it turns the plain error standard on its head.

The plain error standard exists precisely to address trial-level errors—whether by the court or counsel—that undermine a defendant's constitutional rights in a way that warrants correction, even absent preservation. *See Olano*, 507 U.S. at 732–34. While appellate courts generally defer to counsel's strategic decisions, the plain error doctrine acknowledges the reality that representation by counsel does not guarantee perfect safeguarding of a defendant's rights. Trial counsel may fail to request a necessary instruction for a variety of reasons—mistake, inexperience, or even misguided strategy. The plain error standard ensures that, when an obvious legal error affects a defendant's fundamental rights, courts may act to preserve the fairness and integrity of the judicial process.[19]

The majority's rule that a district court never errs in failing to provide a sua sponte instruction when the defendant is represented categorically absolves the district court of responsibility for ensuring the jury is properly instructed and effectively eliminates appellate review for all unpreserved

---

[19] The concurrence "add[s] a few words about the relation between the party-presentation principle … and plain-error review." *Ante*, at 26 (internal citation omitted). Yet it nowhere acknowledges that plain error review *is* "an exception to the norm of party presentation." *Barrados-Zarate v. Barr*, 981 F.3d 603, 605 (7th Cir. 2020).

instructional errors, no matter how apparent or prejudicial the omission.[20] This cannot be the law.

For these reasons, the district court's failure to provide the buyer-seller instruction in this case was error. I now turn to the remaining steps of the plain error analysis.

**B**

**The Remainder of the Plain Error Test is Met**

The error was plain. The majority opinion explains that "[a]n error (had it existed) in not sua sponte instructing the jury on the buyer-seller defense would not have been plain. Page did not present this defense theory, and the evidence of conspiracy was very strong. Nothing about this record would have made it obvious to the district court that such an instruction was needed." *Ante*, at 22. On all three fronts, the majority is wrong.

---

[20] *See Douglas*, 818 F.2d at 1321 (holding that the district court plainly erred by not giving a buyer-seller instruction sua sponte, where the theory had "some foundation in the evidence," and that without the instruction, the jury might have mistakenly believed that mere drug sales alone sufficed to establish a conspiracy); *Gee*, 226 F.3d at 895 (holding that the district court plainly erred and "should have sua sponte included a buyer-seller instruction because it knew that the conspiracy evidence was weak"); *id.* ("[B]ecause the line between a conspiracy and a mere buyer-seller relationship is difficult to discern, district judges should instruct juries in appropriate situations on the distinction.… The proffered evidence of a conspiracy was circumstantial and not overwhelming. The evidence was as consistent with a buyer-seller relationship as it was with a conspiracy. The instructions allowed the jury to make a guilty finding without determining whether the government had proved the existence of a conspiracy.…").

As I explained previously, a buyer-seller theory had some foundation in the evidence, and the evidence of conspiracy was weak. Moreover, it should have been obvious to the district court. The district court's comments at Page's sentencing hearing make this point. The court emphasized the reach of Page's drug distribution and the harm it caused. But even the court remarked that it did not believe—based on "[its] impression from the trial evidence"—that Page had accepted Hamlin's offer to expand their businesses individually or collectively. Sent. Tr. at 40–41. For these reasons, I conclude that the district court's error in not providing the buyer-seller instruction was plain.

The error affected Page's substantial rights because "the failure of the jury to be initially instructed on the defendant['s] theory of defense, where the evidence tying [him] to the larger conspiracy was tenuous, denie[s] [him] a fair trial." *Douglas*, 818 F.2d at 1322.

And the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Indeed, failure to provide the buyer-seller instruction allowed the jury to convict Page of conspiracy to distribute drugs based on evidence that pointed no more to conspiracy than to mere drug distribution. *See Olano*, 507 U.S. at 736.

## III

### On *United States v. Anderson*

Before I conclude, I address *United States v. Anderson*, 99 F.4th 1106 (7th Cir. 2024). The majority has taken the unusual step of criticizing a duly issued recent opinion of our court, rather than following the normal course of seeking to rehear en banc a case it believes a panel of our court wrongly

decided. *See ante*, 22–23. I do not know why the majority spends so much of its time in an opinion about Royel Page's case discussing Denny Anderson's case. In any event, contrary to the majority's complaints, *Anderson* properly applied the plain error standard. I now detour—as the majority has done—to explain why.

The issue in *Anderson* was whether Anderson's 2001 conviction for aggravated assault could have been based on reckless conduct. At the time of his conviction, Florida appellate courts were split on whether aggravated assault included reckless conduct.

The majority here suggests that this split precludes plain error, *see ante*, at 22–23, but the opposite is true. The Supreme Court requires a defendant like Anderson to present only one case showing that the statute applied to reckless conduct. *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) (outlining the realistic-probability test). Anderson did so—indeed, he pointed to two such cases. *See LaValley v. Florida*, 633 So. 2d 1126, 1127–28 (Fla. Dist. Ct. App. 1994); *Kelly v. Florida*, 552 So. 2d 206, 208 (Fla. Dist. Ct. App. 1989). It was thus plain error to rule that the statute never criminalized reckless conduct at the time of Anderson's conviction when courts twice upheld convictions for aggravated assault based on reckless conduct.

The majority also says that no plain error could have occurred in *Anderson* because, in its view, the Florida Supreme Court and Eleventh Circuit ruled differently on the question presented in *Anderson*. *See ante*, at 23. This is wrong for two reasons. First, courts have found plain error even in the face of a circuit split. *See In re Sealed Case*, 573 F.3d 844, 851–52 (D.C. Cir. 2009) (finding plain error despite circuit split because statute was clear); *United States v. Salas*, 889 F.3d 681,

687 (10th Cir. 2018) (finding plain error despite circuit split because law was settled within the circuit). Second, neither the Florida Supreme Court nor the Eleventh Circuit ruled on the narrow state-law question presented in *Anderson.* In 2022, the Florida Supreme Court held that aggravated assault could not be based on reckless conduct. *Somers v. United States*, 355 So. 3d 887, 888 (Fla. 2022). But that ruling said nothing about what Florida's law meant before 2022. Then, relying on *federal* rules of statutory construction, the Eleventh Circuit held that *Somers* applied retroactively. *Somers v. United States*, 66 F.4th 890 (11th Cir. 2023). But we must use Florida's *state* law, not federal law, to interpret Florida's statutes. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1093 (7th Cir. 1999). And as *Anderson* explained, under Florida law, the Florida Supreme Court's interpretation of its aggravated-assault law was plainly not retroactive. *See Florida v. Barnum*, 921 So. 2d 513, 528 (Fla. 2005); *see also Anderson*, 99 F.4th at 1111–12 (discussing Florida statutory interpretation).

Finally, the majority appears to suggest that, because *Anderson*'s analysis involved several steps, its finding of plain error was wrong. But this court has not shied away from finding plain error when an analysis is complex, including when, as in *Anderson*, the court must use the categorical approach. *See, e.g., United States v. Turner*, 55 F.4th 1135, 1142–43 (7th Cir. 2022) (determining on plain-error review that Illinois cocaine conviction was not a felony drug offense); *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020) (same); *United States v. Garcia*, 948 F.3d 789, 792–94 (7th Cir. 2020) (determining on plain-error review that Indiana marijuana conviction was not a felony drug offense); *United States v. De La Torre*, 940 F.3d 938, 950–52 (7th Cir. 2019) (determining, on what the defendants

there acknowledged was plain-error review, that Indiana methamphetamine conviction was not a felony drug offense); *see also United States v. Hagen*, 911 F.3d 891, 895–97 (finding plain error after complex five-part analysis). For these reasons, I disagree with the majority's criticism of *Anderson*.

## IV

### Conclusion

The majority's decision—not *Colon*, as the majority tells it—directly contravenes the Supreme Court's holding in *Direct Sales*. *Direct Sales* does not stand for the proposition that repeat, large-quantity drug transactions alone suffice to sustain a drug distribution conspiracy conviction. Before *Colon*, after *Colon*, and even in our en banc decision in *Lechuga*, our precedent has faithfully adhered to *Direct Sales*'s clear call for intent to join the conspiracy as evidenced by informed and interested cooperation, stimulation, or instigation, even where a buyer and seller repeatedly transact in distribution-quantities of drugs. The majority, unable to point to a single case from this court endorsing its interpretation or any compelling justification for overturning our precedent, nevertheless forges ahead with a new rule.

Likewise, the district court plainly erred by failing to provide sua sponte the buyer-seller instruction. The majority's holding, that a district court cannot plainly err by failing to sua sponte give a buyer-seller instruction when a defendant does not request one, as well as the various other justifications offered by the majority to excuse the district court's error, compound the problem and raise significant constitutional concerns.

Today's decision departs from decades of precedent, and I cannot join it. A better course of action would be to suggest (not require) that district judges, when they hear evidence in or near equipoise, simply ask the parties: "If any party thinks a buyer-seller instruction would be appropriate, would you please let me know?" If the parties ask for the instruction, appeals like this one are unnecessary. If the parties decline the instruction, appeals like this one are waived.

I respectfully dissent.